IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| **FAYE COTTMAN**,<br>846 McAleer Court<br>Baltimore City, Maryland 21202 | **CLASS ACTION COMPLAINT<br>AND JURY DEMAND** |
| **DAMON GRAY,**<br>2029 Sunset Drive<br>Baltimore City, Maryland 21223 | |
| **AMBER SPENCER**,<br>7306 Clarity Court<br>Windsor Mill, Maryland 21244<br>Baltimore County | Civil Action No. 21-00837 (SAG) |
| and, | |
| **AUDREY CARTER**, as Successor in Interest<br>to **DWAYNE D. CHEEKS**, Deceased,<br>1041 North Aisquith Street<br>Baltimore City, Maryland 21202 | |
| on behalf of themselves and those similarly<br>situated, | |
| Plaintiffs, | |
| v. | |
| **BALTIMORE POLICE DEPARTMENT,**<br>601 E. Fayette Street<br>Baltimore, Maryland 21202 | |
| *Serve on:*<br>Kara K. Lynch, Esq.<br>Baltimore City Department of Law<br>100 N. Holliday Street, Suite 101<br>Baltimore, Maryland 21202 | |

**BRANDON SCOTT,**
Mayor of Baltimore, in his Official Capacity,

> *Serve on:*
> Kara K. Lynch, Esq.
> Baltimore City Department of Law
> 100 N. Holliday Street, Suite 101
> Baltimore, Maryland 21202

**MICHAEL S. HARRISON** (#T924),
Commissioner, in his Individual and Official
Capacity,

> *Serve on:*
> Kara K. Lynch Esq.
> Baltimore City Law Department
> 100 N. Holliday Street, Suite 101
> Baltimore, Maryland 21202

**GARY TUGGLE** (#D736),
former Interim Commissioner, in his Individual
and Official Capacity,

> *Serve on:*
> Kara K. Lynch Esq.
> Baltimore City Law Department
> 100 N. Holliday Street, Suite 101
> Baltimore, Maryland 21202

**DARRYL D. DE SOUSA** (#E403),
former Commissioner, in his Individual and
Official Capacity,

> *Serve on:*
> Kara K. Lynch Esq.
> Baltimore City Law Department
> 100 N. Holliday Street, Suite 101
> Baltimore, Maryland 21202

**BRIAN NADEAU** (#T957),
Deputy Police Commissioner, in his Official
Capacity,

> *Serve on:*
> Kara K. Lynch Esq.
> Baltimore City Law Department

100 N. Holliday Street, Suite 101
Baltimore, Maryland 21202

**JEFFREY A. CONVERSE** (#H218),
Detective, in his Individual and Official
Capacity,

> *Serve on:*
> Christopher C. Jeffries, Esq.
> Kramon & Graham, P.A.
> One South Street, Suite 2600
> Baltimore, Maryland 21202

**DESTINEE L. MACKLIN** (#J500),
Detective, in her Individual and Official
Capacity,

> *Serve on:*
> Christopher C. Jeffries, Esq.
> Kramon & Graham, P.A.
> One South Street, Suite 2600
> Baltimore, Maryland 21202

**ANNMARIE DIPASQUALE** (#J754),
Detective, in her Individual and Official
Capacity,

> *Serve on:*
> Baltimore Police Department
> c/o 601 E. Fayette Street
> Baltimore, Maryland 21202

**SCOTT DRESSLER** (#F070),
Lieutenant, in his Individual and Official
Capacity,

> *Serve on:*
> Baltimore Police Department
> c/o 601 E. Fayette Street
> Baltimore, Maryland 21202

**MARK WALRATH** (#E808),
Lieutenant, in his Individual and Official
Capacity,

*Serve on:*
Baltimore Police Department
c/o 601 E. Fayette Street
Baltimore, Maryland 21202

**ROBERT ROSS** (#H216),
Sergeant Detective, in his Individual and Official
Capacity,

     *Serve on:*
     Baltimore Police Department
     c/o 601 E. Fayette Street
     Baltimore, Maryland 21202

**RYAN O'CONNOR** (#I702),
Detective, in his Individual and Official
Capacity,

     *Serve on:*
     Baltimore Police Department
     c/o 601 E. Fayette Street
     Baltimore, Maryland 21202

     and,

**BPD OFFICERS JOHN/JANE DOES 1 to 20,**
and **SUPERVISORY BPD OFFICERS
JOHN/JANE DOES 1 to 20,** in their Individual
and Official Capacities,

     *Serve on:*
     Baltimore Police Department
     c/o 601 E. Fayette Street
     Baltimore, Maryland 21202

     Defendants.

## AMENDED CLASS ACTION COMPLAINT

Named Plaintiffs, by the undersigned attorneys Orrick, Herrington & Sutcliffe LLP and

the Lawyers' Committee for Civil Rights Under Law, bring this action on behalf of themselves

and all other similarly situated persons ("Class Members") against the Baltimore Police

Department ("BPD"); individual BPD officers and BPD supervisory officers known and

unknown; the current Mayor of Baltimore City, Maryland; and former and current BPD

Commissioners.  In support, Plaintiffs state as follows:

## INTRODUCTION

1.      This is a case about BPD's pattern and practice of unconstitutionally searching,

seizing, retaining, and destroying the personal property of victims of violent crimes in Baltimore.

This pattern and practice must end, which is why Plaintiffs bring this case.

2.      Plaintiff Damon Gray and the representative class members are victims of serious

assaults that occurred in or around Baltimore City, Maryland between April 2018 and April

2021.  After they were assaulted, they also became the victims of BPD.

3.      When Plaintiff Gray and the representative class members were at their most

vulnerable—having suffered significant injuries as victims of violent crime—BPD officers

unlawfully seized, searched, and destroyed property owned by Plaintiffs or by decedents for the

vindication of whose civil rights Plaintiffs are proceeding as successors in interest (the "Subject

Property") without a warrant or consent.  Moreover, without explanation, BPD has retained

possession of the Subject Property and either refused or ignored requests to return the Subject

Property, causing injury, inconvenience, and humiliation to Plaintiffs.

4.      BPD is no stranger to violating the federal and state constitutional rights of the

Baltimore residents it is required to protect and serve.  Significant violations have persisted

across the administrations and tenures of multiple local elected officials and appointed law

enforcement officials, indicating a culture of noncompliance that can only be remedied by court

intervention.  Since at least the 1990s, when BPD leadership instituted what it called "zero

tolerance" policies, police officers with minimal training, oversight, and accountability structures

conducted a large number of stops, searches, and arrests—many improper and illegal—

accompanied by frequent uses of force, causing frayed relationships between Baltimore residents and BPD.

5.      More recently, in April 2015, after Freddie Gray was fatally injured while in BPD custody, then-Baltimore Mayor Stephanie Rawlings-Blake asked the United States Department of Justice ("DOJ") to investigate BPD's policies and its long-standing history of aggressive, and abusive, unconstitutional policing tactics.

6.      In August 2016, the DOJ concluded its investigation and issued its report finding "reasonable cause to believe that BPD engages in a pattern or practice of conduct that violates the Constitution or federal law," and noting BPD's yearslong pattern and practice of conducting unreasonable searches and seizures.  (DOJ Civil Rights Division, *Investigation of the Baltimore City Police Department*, 3 (August 10, 2016) ("DOJ Report")).

7.      As a result of DOJ's investigation, on January 12, 2017, the United States District Court for the District of Maryland approved a Consent Decree between BPD and the United States, and subsequently appointed an independent monitor and a monitoring team to serve as agents of the court in overseeing the implementation of the Consent Decree.

8.      This action seeks redress for the deprivation of Class Members' rights guaranteed by the United States Constitution, directly resulting from the conduct of BPD officers acting in accord with BPD's pattern or practice of unlawfully searching, seizing, and destroying the property of victims of serious assaults in violation of Plaintiffs' Fourth and Fourteenth Amendment rights guaranteed by the United States Constitution, and of which BPD knew or should have known.

9.      The Defendants—BPD, current BPD Commissioner Michael S. Harrison, and former BPD Commissioners Gary Tuggle and Darryl D. De Sousa; Current Mayor Brandon

Scott; and individual and supervisory BPD officers, known and unknown, including Detective

Jeffrey A. Converse, Detective AnnMarie DiPasquale, Detective Destinee L. Macklin,

Lieutenant Scott Dressler, Lieutenant Mark Walrath, and Sergeant Detective Robert Ross—are

responsible for violating Plaintiffs' rights.

## JURISDICTION AND VENUE

10.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation

under color of law of Plaintiffs' rights as secured by the United States Constitution.

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

12.     Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to the

claims in this Complaint occurred in the State of Maryland.

13.     This case was timely filed within three years from the date of the injuries incurred

to all Plaintiffs.

## THE PARTIES

### A.     Named Plaintiffs

14.     Plaintiff **Damon Gray** is a 23-year-old Black man who resides in the City of

Baltimore, Maryland.  On June 29, 2019, a stranger shot Mr. Gray approximately seven times in

the back, neck, and chest while Mr. Gray was walking in and around Catherine Street in the

southwest area of Baltimore.  Mr. Gray was transported by ambulance to the hospital where BPD

officers seized without consent his cell phone, a bracelet, a necklace, and several articles of

clothing.  These items remain in BPD custody.

15.     Plaintiff **Amber Spencer** is a 27-year-old Black woman who resides in the

County of Baltimore, Maryland.  Just before midnight on March 20, 2020, a stranger shot Ms.

Spencer in the head and chest while she was attending a cookout near 1800 North Chapel Street

in Baltimore, Maryland.  After the shooting, Ms. Spencer was transported by ambulance to Johns

Hopkins Hospital, where BPD officers seized her personal property without her consent,

including her cell phone, jeans, shirt, shoes, car key, and approximately $400 in U.S. currency.

These items remain in BPD custody.

16.     Plaintiff **Faye Cottman** is a 36-year-old Black woman who resides in the City of

Baltimore, Maryland.  On March 14, 2019, a woman that Ms. Cottman did not know shot Ms.

Cottman and her then-11-year-old son in the head while he was playing with his brother at a

playground in the Cherry Hill area of Baltimore, Maryland.  BPD officers arrived at the scene

and seized Ms. Cottman's personal property without consent, including her jacket, cell phone,

wig, and shoes.  Despite numerous unsuccessful attempts to reclaim her personal property from

BPD, these items remain in BPD custody.

17.     Plaintiff **Audrey Carter** is a 58-year-old Black woman who resides in the City of

Baltimore, Maryland.  On June 9, 2018, her son, Dwayne D. Cheeks, was shot and killed in the

2200 Block of Germania Avenue in Baltimore City.  BPD officers seized, inventoried, and

logged in the Evidence Control Unit ("ECU") all of Mr. Cheeks's effects, including his driver's

license, cell phone, a lottery ticket, keys, and cash.  Ms. Carter, as successor in interest, contacted

BPD officers and Baltimore City Council members and staff (including current-Baltimore City

Mayor Brandon Scott who at the time was the City Council President) on at least 20 occasions

requesting the release of her son's property.  In December 2019, BPD finally released the cash to

Ms. Carter, but refused to return any other property.  On December 12, 2019, Lieutenant Walrath

informed Ms. Carter that BPD had destroyed much of the property they had seized from her son.

Thus, despite Ms. Carter's repeated requests to retrieve her son's property, and in direct violation

of BPD written policies and Ms. Carter's and her son's constitutional rights, sometime between

June 9, 2018 and December 12, 2019, BPD inexplicably destroyed much of Mr. Cheeks's seized property.

        **B.**     **Defendants**

        *Entities*

18.     Defendant **BPD** is the primary law enforcement agency whose jurisdiction covers Baltimore, Maryland.  At all times relevant in this Complaint, BPD is or was the employer of the police officers responsible for the seizure of the Subject Property.  BPD, through its agents and employees, hired, supervised, and trained each of the identified and unidentified officers named in this Complaint.  BPD acted under color of law when it hired, supervised, and trained, and retained each identified and unidentified BPD Officer named in this Complaint.

        *Officials*

19.     Defendant **Michael S. Harrison** (Seq. No. T924) is the current BPD Commissioner.  Defendant Harrison became BPD Commissioner on or about March 12, 2019. In his capacity as BPD Commissioner, Defendant Harrison acted under color of law when he exercised policy-making authority for BPD; established policies and procedures for screening, hiring, training, monitoring, and supervising police officers; and enforced the duties, conduct, and discipline of police officers and other BPD employees.  At all times relevant herein, Defendant Harrison acted as an agent and/or employee of BPD, as well as Baltimore City, and acted within the scope of his employment.  Defendant Harrison is sued in his official capacity as the Commissioner of BPD and in his individual capacity.

20.     Defendant **Gary Tuggle** (Seq. No. D736) was Interim BPD Commissioner from May 2018 to March 2019.  In his capacity as Interim BPD Commissioner, Defendant Tuggle acted under color of law when he exercised policy-making authority for BPD; established

policies and procedures for screening, hiring, training, monitoring, and supervising officers; and enforced the duties, conduct, and discipline of officers and other BPD employees.  At all times relevant herein, Defendant Tuggle acted as an agent and/or employee of BPD, as well as Baltimore City, and acted within the scope of his employment.  Defendant Tuggle is sued for acts taken in his official capacity as the Interim Commissioner of BPD and in his individual capacity.

21.     Defendant **Darryl D. De Sousa** (Seq. No. E403) (together with **Michael S. Harrison** and **Gary Tuggle**, the **"BPD Commissioners"**) was BPD Commissioner from January 2018 to May 2018.  In his capacity as BPD Commissioner, Defendant De Sousa acted under color of law when he exercised policy-making authority for BPD; established policies and procedures for screening, hiring, training, monitoring, and supervising officers; and enforced the duties, conduct, and discipline of officers and other BPD employees.  At all times relevant herein, Defendant De Sousa acted as an agent and/or employee of BPD, as well as Baltimore City, and acted within the scope of his employment.  Defendant De Sousa is sued for acts taken in his official capacity as the Commissioner of BPD and in his individual capacity.

22.     Defendant **Brian Nadeau** (Seq. No. T957) is a Deputy Commissioner of the Baltimore Police Department who assumed his role on September 3, 2019.  His responsibilities include to oversee BPD's Internal Affairs Division (IAD) and its Public Integrity Bureau (PIB). Defendant Nadeau is sued in his official capacity for acts taken as a current BPD Deputy Commissioner overseeing BPD's IAD and PIB and as successor to official actions taken by Deputy Commissioners that are at issue in this case.  As the BPD Deputy Commissioner overseeing BPD's IAD and PIB, Defendant Nadeau was empowered to investigate allegations of misconduct by BPD officers and employees in order to assure that all personnel abide by the

rules and regulations governing their conduct.

23.     Defendant **Mayor of the City of Baltimore Brandon Scott** is the current Mayor of Baltimore City who took office on December 8, 2020.  From September 2019 to December 8, 2020, Defendant Scott was the President of the City Council.  Before becoming City Council President, Defendant Scott was a Councilmember from 2011 to September 2019.  Defendant Scott is sued in his official capacity for acts taken as the current Baltimore City Mayor and successor to official actions taken by past Baltimore City Mayors that are at issue in this case. As the Baltimore City Mayor, Defendant Scott has the power to appoint and remove the BPD Commissioner at his pleasure.  Furthermore, in his capacity as the Baltimore City Mayor, Defendant Scott swore an oath to uphold the U.S. Constitution and the laws of the State of Maryland.

24.     Defendant **Detective Jeffrey A. Converse** (Seq. No. H218) is a police officer employed by BPD since February 19, 2002.  At all times relevant herein, Defendant Converse was acting under color of law and in the course and scope of his employment as a police officer with BPD.  Defendant Converse is sued in his official capacity for acts taken as a BPD officer and in his individual capacity.

25.     Defendant **Detective AnnMarie DiPasquale** (Seq. No. J754) is a police officer employed by BPD since at least January 22, 2017, and currently is assigned to the Southwestern District.  At all times relevant herein, Defendant DiPasquale was acting under color of law and in the course and scope of her employment as a police officer with BPD.  Defendant DiPasquale is sued in her official capacity for acts taken as a BPD officer and in her individual capacity.

26.     Defendant **Detective Destinee L. Macklin** (Seq. No. J500) is a police officer employed by BPD since March 28, 2014.  At all times relevant herein, Defendant Macklin was

acting under color of law and in the course and scope of her employment as a police officer with BPD.  Defendant Macklin is sued in her official capacity for acts taken as a BPD officer and in her individual capacity.

27.     Defendant **Lieutenant Scott Dressler** (Seq. No. F070) is a police officer employed by BPD since March 29, 1993.  At all times relevant herein, Defendant Dressler was acting under color of law and in the course and scope of his employment as a police officer with BPD.  Defendant Dressler is sued in his official capacity for acts taken as a BPD officer and in his individual capacity.

28.     Defendant **Lieutenant Mark Walrath** (Seq. No. E808) is a police officer employed by BPD since May 5, 1992.  At all times relevant herein, Defendant Walrath was acting under color of law and in the course and scope of his employment as a police officer with BPD.  Defendant Walrath is sued in his official capacity for acts taken as a BPD officer and in his individual capacity.

29.     Defendant **Sergeant Detective Robert Ross** (Seq. No. H216) is a police officer employed by BPD since February 14, 2002.  At all times relevant herein, Defendant Ross was acting under color of law and in the course and scope of his employment as a police officer with BPD.  Defendant Ross is sued in his official capacity for acts taken as a BPD officer and in his individual capacity.

30.     Defendant **Detective Ryan O'Connor** (Seq. No. I702) is a police officer employed by BPD since April 7, 2009.  At all times relevant herein, Defendant O'Connor was acting under color of law and in the course and scope of his employment as a police officer with BPD.  Defendant O'Connor is sued in his official capacity for acts taken as a BPD officer and in his individual capacity.

31.     Defendants **BPD Officers John/Jane Does 1 to 20** (together with **Det. Jeffrey Converse, Det. Destinee Macklin, Det. AnnMarie DiPasquale, Lt. Scott Dressler, Lt. Mark Walrath, Sgt. Det. Robert Ross,** and **Det. Ryan O'Connor,** the **"Officer Defendants"**) were or are police officers employed by BPD during the relevant time frame.  At all times relevant herein, Defendant BPD Officers John/Jane Does 1 to 20 were acting under color of law and in the course and scope of their employment as police officers with BPD.  Defendants BPD Officers John/Jane Does 1 to 20 are sued in their official capacities for acts taken as BPD officers and in their individual capacities.

32.     Defendants **Deputy Commissioner Brian Nadeau**, **Lt. Scott Dressler, Lt. Mark Walrath, Sgt. Det. Robert Ross** and **Supervisory BPD Officers John/Jane Does 1 to 20 (**the **"Supervisory Defendants"** and together with **BPD, the BPD Commissioners, the Baltimore City Mayor,** and **the Officer Defendants**, collectively the **"Defendants")** were or are supervisory police officers employed by BPD during the relevant time frame.  At all times relevant herein, the Supervisory Defendants were acting under color of law and in the course and scope of their employment as police officers with BPD.  Supervisory Defendants are sued in their official capacities for acts taken as BPD officers and in their individual capacities.

## CLASS ALLEGATIONS

33.     Under Rules 23(a) and 23(b)(1) and (2) of the Federal Rules of Civil Procedure, Plaintiff Damon Gray brings this action on behalf of himself and other similarly situated residents of the City of Baltimore who were victims of serious assaults—including on behalf of deceased victims, their personal representatives, successors in interest, and/or next of kin—on or after April 1, 2018 and whose property BPD unlawfully seized without a warrant or consent (the "**Plaintiff Class**") pursuant to BPD Policies 703 and/or 1401.

34.    Plaintiff Amber Spencer also brings this action on behalf of herself and on behalf of a subclass of the Plaintiff Class whose property BPD has not returned (the "**Continuing Seizure Subclass**") pursuant to BPD Policies 703 and/or 1401.

35.    Plaintiff Amber Spencer also brings this action on behalf of herself and on behalf of a subclass of the Plaintiff Class whose U.S. currency BPD unlawfully seized and has not returned (the "**Currency Seizure Subclass**") pursuant to BPD Policies 703 and/or 1401.

36.    Plaintiff Faye Cottman also brings this action on behalf of herself and on behalf of a subclass of the Plaintiff Class whose cell phone contents BPD unlawfully searched (the "**Illegal Phone Search Subclass**") pursuant to BPD Policies 703 and/or 1401.

37.    Plaintiff Audrey Carter also brings this action on behalf of herself and on behalf of a subclass of the Plaintiff Class whose property BPD unlawfully destroyed (the "**Property Destruction Subclass**") pursuant to BPD Policies 703 and/or 1401.  The Property Destruction Subclass includes plaintiffs proceeding as successors in interest to decedents whose rights were so violated.

38.    The Plaintiff Class, Continuing Seizure Subclass, Currency Seizure Subclass, Illegal Phone Search Subclass, and Property Destruction Subclass are so numerous that joinder of all the members would be impracticable.  Over 2,100 incidents classified as "shootings" have occurred in Baltimore since April 2018.  *See* BPD Part 1 Victim Based Crime Dataset, available at https://tinyurl.com/y57nt2yl.

39.    Because BPD's handling of property in these cases is dictated by BPD Policies 703 and 1401, based on information and belief, the victims of these serious assaults were subject to searches pursuant to these policies.  Indeed, Plaintiffs have received information indicating that this practice is widespread and at least one staff member of a Baltimore-area hospital has

indicated that these practices are routine.

40.     As a direct result of the Defendants' customs, practices, and policies relating to the seizure, retention, and destruction of property belonging to victims of serious assaults and—in the case of the Illegal Phone Search Subclass—searching crime victims' property without a warrant or consent, the members of the Plaintiff Class and the identified Subclasses were and continue to be deprived of their constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

41.     Defendants' destruction of and failure to return the Subject Property to members of the Plaintiff Class constitutes a continuing and ongoing violation of the Plaintiff Class and Subclass Members' rights.

42.     Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class. Plaintiffs Spencer, Cottman, and Carter likewise will fairly and adequately protect the interests of the respective Subclasses.  Plaintiffs have no conflicts involving other Class Members or Defendants.  Plaintiffs understand their role as class representatives and their duties to the class in this litigation.  Plaintiffs are represented by competent and skilled counsel whose interests are fully aligned with the interests of the class.

43.     Questions of fact and law are common to the class.  These questions include:

   a.   Whether BPD's pattern and practice of seizing property without a warrant was constitutional.

   b.   For members of the Continuing Seizure Subclass and the Currency Seizure Subclass, whether Defendants committed an ongoing violation of the rights of the members of the Plaintiff Class by failing to return the Subject Property.

   c.   For members of the Illegal Phone Search Subclass, whether BPD's search of the members' cell phone without consent and/or probable cause constitutes a violation of the Subclass members' constitutional rights.

   d.   For members of the Property Destruction Subclass, whether Defendants violated the constitutional rights of the members of the Plaintiff Class by destroying, rather than returning, the Subject Property.

44.     Separation of the Plaintiff Class into individual actions creates a risk of "inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).

45.     The outcome of this action will affect individuals who are victims of serious assaults (including, in the case of a deceased victim, their personal representatives and/or next of kin) whose property was seized and/or searched by BPD in the course of responding to and purportedly investigating the reported crime.  The interests of these individuals are inadequately protected absent certification of the Plaintiff Class, as this case involves adjudication of those interests.  Fed. R. Civ. P. 23(b)(1)(A).

46.     Defendants here have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"  Fed. R. Civ. P. 23(b)(1)(A).  BPD's actions taken with regard to the Subject Property were dictated by policy as part of a broader pattern and practice of unconstitutional conduct directed at victims of serious assaults as a class.

## FACTS

A.      **BPD unlawfully seized and searched the Subject Property while Plaintiffs were at their most vulnerable after suffering severe injuries as innocent bystanders to and victims of violent crimes.**

### *Ms. Faye Cottman*

47.     On March 14, 2019, a stranger shot Ms. Faye Cottman and her then-11-year-old son at a playground in the Cherry Hill area of Baltimore, Maryland.  The shooter, a woman living across the street from the playground, approached Ms. Cottman's 11-year-old son, started a conversation with him, and then shot at the boy.  When Ms. Cottman saw the woman pointing a gun at her son, Ms. Cottman ran towards them.  As Ms. Cottman ran to protect her son, the shooter shot him in the head.  Ms. Cottman threw herself on top of her son and pleaded with the shooter not to kill them.  The shooter then pointed the gun at Ms. Cottman and pulled the trigger twice, but the gun jammed.  On the third attempt, the shooter shot Ms. Cottman in the back of the head, then ran away.

48.     Both Ms. Cottman and her son suffered serious head injuries as a result of the shooting.  Ms. Cottman was briefly hospitalized, while her son was hospitalized for several weeks and is now disabled as a result of the attack.

49.     After the shooting, Ms. Cottman called her husband from the playground who arrived minutes later and immediately called emergency services.  BPD dispatched Defendant Macklin to the scene.  According to publicly available news reports about the shooting, BPD officers apprehended the shooter at the crime scene and took her into police custody.

50.     While Ms. Cottman was in a disoriented state and before she was treated for her injuries, Defendant Macklin seized Ms. Cottman's jacket, phone, wig, and shoes without consent.

51.     Defendant Macklin did not provide Ms. Cottman or her husband with any paperwork documenting the seizure of her personal property.  Defendant Macklin did not provide Ms. Cottman with any information about how to reclaim her property.

52.     After unlawfully seizing Ms. Cottman's cell phone, Defendant Macklin and/or BPD officers illegally searched Ms. Cottman's phone without Ms. Cottman's consent or a search warrant.

53.     Shortly after the shooting, on the same day, Defendant Macklin visited Ms. Cottman in the hospital to investigate the shooting.  At the time of Defendant Macklin's visit, Ms. Cottman was recovering from a procedure to remove the bullet from her head.  Defendant Macklin asked Ms. Cottman whether she knew the shooter, and Ms. Cottman said she did not.  In response, Defendant Macklin explained how she was able to search Ms. Cottman's cell phone going back over a long period of time to see whether Ms. Cottman had any communications with the shooter.  Ms. Cottman reiterated that she had no prior relationship with the shooter and that she never saw her before in her life.  Ms. Cottman also asked Defendant Macklin about her cell phone, and Defendant Macklin stated that it was evidence.

54.     Based on publicly available records, on September 11, 2019, the Baltimore City Circuit Court (the "Circuit Court") found the shooter not criminally responsible for her conduct and ordered that she be committed to a psychiatric institution.  The Circuit Court closed the case that same day.  Despite the case resolution, neither Defendant Macklin nor BPD contacted Ms. Cottman to inform her of the case disposition, or how to reclaim her property.

55.     On May 6, 2020, Defendant Macklin was contacted regarding Ms. Cottman's property.  Defendant Macklin said she remembered Ms. Cottman's case and that she could release Ms. Cottman's property because the case had reached a disposition.  Defendant Macklin

proposed meeting Ms. Cottman in person to return the seized items but claimed that she first

needed her sergeant's permission due to the COVID-19 pandemic.  Detective Macklin asked for

a follow-up call one week later to confirm plans to return Ms. Cottman's property.  Subsequent

attempts to contact Detective Macklin were unsuccessful.  Ms. Cottman's property remains in

BPD custody.

### *Ms. Amber Spencer*

56.     On March 20, 2020, a stranger shot Ms. Amber Spencer in the head and chest

while celebrating her boyfriend's birthday at a cookout near the 1800 block of North Chapel

Street in Baltimore City, Maryland.  After the shooting, Ms. Spencer was transported by

ambulance to Johns Hopkins Hospital, also in Baltimore City, Maryland.

57.     Defendant Converse visited Ms. Spencer at the hospital shortly after the shooting

occurred.  While at the hospital, Defendant Converse seized Ms. Spencer's cell phone, jeans,

shirt, shoes, and approximately $400 in U.S. currency without her consent or a warrant.  BPD

also seized the key to Ms. Spencer's car.  These items remain in BPD custody.

58.     Defendant Converse did not provide Ms. Spencer with a police report or any

paperwork documenting the seizure.  Ms. Spencer asked Defendant Converse how to reclaim the

seized property.  In response, Defendant Converse told Ms. Spencer she would have to retrieve

her property from BPD at the police station but would not be able to do so immediately because

of the COVID-19-related restrictions.

59.     Ms. Spencer communicated with Defendant Converse after Ms. Spencer's

property was seized, including once in or around mid-April 2020 and again in or around June

2020.  Each time, Defendant Converse stated to Ms. Spencer that he was unable to return her

property and said that she could retrieve her property when the state of Maryland and Baltimore

City entered "phase 3" of COVID-19 reopening.  Ms. Spencer's property remains in BPD custody.

### Mr. Damon Gray

60.     On June 29, 2019, a stranger shot Mr. Damon Gray approximately seven times in the back, neck, and chest while Mr. Gray was walking on or around Catherine Street in the southwest area of Baltimore, Maryland.  The attack rendered Mr. Gray severely disabled, forcing him to undergo seven months of extensive treatment and rehabilitation both in the hospital and at a rehabilitation facility.  More than a year later Mr. Gray continues to undergo intensive physical therapy three times a week.

61.     After the shooting, a disoriented Mr. Gray was transported by ambulance to the hospital.  While at the hospital, Defendant DiPasquale seized Mr. Gray's cell phone, a bracelet, a necklace, and several articles of clothing without first obtaining a warrant or Mr. Gray's consent.

62.     Defendant DiPasquale did not provide Mr. Gray with documentation of the seizure or any information about how to reclaim his personal property.  Mr. Gray's property remains in BPD's custody.

### Ms. Audrey Carter

63.     On June 9, 2018, Ms. Carter's son, Dwayne D. Cheeks, was shot and killed in the 2200 Block of Germania Avenue in Baltimore City.  BPD contacted Ms. Carter as next of kin as they nearly simultaneously published the details of her son's murder on social media.  BPD officers seized, inventoried, and logged Mr. Cheeks's property into BPD's Evidence Control Unit, including a cell phone, a watch, a driver's license, debit/credit cards, earphones, a lottery ticket, a key holder with two keys, two separate silver keys, a partially empty pack of cigars, a lighter, $435 dollars in U.S. Currency, and numerous articles of clothing.

64.     Seeking to preserve her son's memory and bring his killer to justice, Ms. Carter immediately began pursuing two goals: to assist BPD in identifying Dwayne's killer, and to recover Dwayne's seized property to the extent it was not relevant to BPD's underlying criminal investigation of her son's killer.  To assist BPD in identifying Dwayne's killer, Ms. Carter knocked on doors, handed out leaflets, and spoke with community members who may have helpful information.  To recover her son's seized property, Ms. Carter reached out to BPD to request that the property be returned to her as Mr. Cheeks's next of kin and rightful claimant. Specifically, Ms. Carter made repeated requests to Defendant Officers O'Connor, Ross, and Walrath.

65.     Despite her efforts, by December 2019, BPD had yet to release any of Mr. Cheeks's property to Ms. Carter.  On December 12, 2019, Defendant Walrath notified Ms. Carter that Defendant O'Connor would arrange the release of the $435 in cash to her.  That same day, Defendant Walrath also informed Ms. Carter that BPD had destroyed the following items belonging to her son: his driver's license, a Visa card, an independence card, at least two debit/credit cards, earphones, a lottery ticket, a key holder with two keys, two separate silver keys, and a partially empty pack of cigars.  When Ms. Carter learned that her late son's property had been destroyed despite her efforts to collect it, she became distressed—for Ms. Carter, these were the last items her son carried with him before his death.  Many of the items have sentimental value.  For example, Ms. Carter's mother and son enjoyed playing the lottery together and often spoke about what they would do if they ever won big; to have the last lottery ticket her son had purchased in her possession would have meant a lot to Ms. Carter.  BPD also destroyed Mr. Cheeks's driver's license, something Ms. Carter planned to give to her grandchildren (Dwayne's minor children) to keep in memory of their father.

66.     When Ms. Carter asked Defendant Ross to explain why BPD ignored her repeated

requests for her son's belongings and instead destroyed them, Defendant Ross wrote:

> I cannot tell you why it was destroyed. The Homicide Unit did not authorize
> anything to be destroyed, nor do we ever authorize[] evidence in a homicide
> investigation to be destroyed. Lt. Dressler with the Evidence Control Unit
> authorized the destruction of the property. He is the commanding officer of the
> evidence control unit.

67.     Ms. Carter asked Defendant Ross where Defendant Dressler received

authorization to destroy her son's property.  Defendant Ross wrote:

> I don't know. I don't work for Lieutenant Dressler nor do I work in the evidence
> control unit. You might be better off contacting him directly. He is the commanding
> officer of the evidence control unit. He can be reached at 4100-396-2048. My
> command has been notified of the mishap. Lt. Walrath and I have initiated an
> investigation into how this happened. We'll be in touch with our results upon
> completion.

Ms. Carter never received the results of Defendant Walrath's and Defendant Ross's

investigation.

68.     On the same day that Defendant Ross disclaimed responsibility for the destruction

of Ms. Carter's son's property, Ms. Carter emailed City Councilman Defendant Stokes at

Robert.Stokes@baltimorecity.gov and his chief of staff, Kathy Christian at

Kathy.Christian@baltimorecity.gov.  To Ms. Christian, she wrote:

> Could you or Councilman Stokes assist me in finding out why the Baltimore City
> Police destroyed evidence in my son, Dwayne Cheeks' open homicide investigation
> without returning it to me or notifying me? I was told that I could not receive it
> back because the Police and the States' Attorney needed it to prosecute a suspected
> defendant. My son was killed on June 9, 2018. Now, I am told by the Police that
> some of the evidence in his case has been destroyed. I feel like I am being
> traumatized once again by the people who are suppose[d] to be helping me.

Also that same day, Ms. Carter forwarded the above message and included the following to

Defendant Stokes:

> Is there anything you can do to help me in this situation? Police Commissioner
> Harris needs to know that this type of thing [is] happening. If it happened to me, it

- 22 -

> probably has happened to others.  How can citizens trust police if they are lying to them in one instance and destroying evidence in another.

Neither Defendant Stokes nor his staff responded.  The City Council did not respond either. Despite having actual knowledge of the irregularities at BPD that were causing ongoing constitutional violations, the City Council took no action in response to Ms. Carter's written complaints.  In fact, in June 2020, the City Council passed several amendments to BPD's budget for fiscal year 2021 including eliminating "budgeted overtime" for Crime Laboratory and Evidence Control services.  *See generally*, *Baltimore City Summary of the Adopted Budget, Fiscal 2021* (available at: https://tinyurl.com/272t6txa)*; see also* City of Baltimore Ordinance 20.368, Council Bill 20-0527, adopted on June 15, 2020.

> 69.    After Ms. Carter contacted City Council members and staff, Ms. Carter called BPD's ECU seeking an explanation.  An individual employed in BPD's ECU responded to Ms. Carter's inquiries and said BPD had sent a letter to afford her an opportunity to claim the property before it was destroyed but that the letter was returned.  Ms. Carter learned, from Defendant Dressler, that the ECU had first mailed a letter to her deceased son and later mailed a second letter to the address of an apartment Ms. Carter left five years earlier.  Despite the fact that Ms. Carter had been in near-constant communication with Detective O'Connor since her son's death and that Detective O'Connor knew Ms. Carter's current address, BPD's ECU nevertheless sent the letter to the wrong address and subsequently destroyed Ms. Carter's son's property without notifying her.  When Ms. Carter asked for a copy of the letter, she was told that she "needed to speak with the BPD legal department."  According to Defendant Ross, the property also was destroyed in violation of BPD's own policies.  For example, Policy 1401 provides that an ECU "supervisor may change the status [of evidence related to a homicide case] to 'unfreeze' allowing it to be placed on the disposal list or released to the claimant *only if the*

***investigating detective, responsible BPD member, or states attorney has notified an ECU***

***supervisor that it can be authorized***."  (emphasis added).

70.     Ms. Carter filed two formal complaints with the BPD's Public Integrity Bureau.

First, she filed a complaint in-person in about August or September of 2019 complaining that

Defendant O'Connor did not respond to calls or messages or communicate with her, and that he

provided the incorrect address to the ECU.  She filed another complaint by phone on December

19, 2019 complaining that BPD had unlawfully destroyed her son's property rather than

returning it to her.  She received nearly identical form responses to each complaint from BPD's

Public Integrity Bureau stating that "[t]he investigation has revealed that the available evidence

did not meet the burden of proof necessary to sustain the allegation(s)."  The letter dismissing

her complaint against Defendant O'Connor was dated December 17, 2019 and postmarked

February 5, 2020.  The letter dismissing her complaint regarding the unlawful destruction of

property was dated February 27, 2020 and postmarked March 25, 2020.

71.     On December 30, 2019, Ms. Carter emailed Defendant and current-Baltimore

City Mayor Scott, who at that time was the City Council President.  In her email, Ms. Carter

explained that BPD had destroyed her son's property and asked that Defendant Scott "bring this

matter immediately to the attention of Commissioner Harrison, the Mayor, other Councilpersons

and other city agencies so that no other mother and family is devastated and retraumatized."

Defendant Scott sent a brief reply requesting more information.  Neither Defendant Scott nor his

staff wrote again, and to Ms. Carter's knowledge, Defendant Scott took no steps to investigate or

address the issues Ms. Carter raised in her email.

72.     Since being sworn in as the current Baltimore City Mayor, and despite having

actual knowledge of these ongoing constitutional violations by BPD officers, Defendant Scott

has done nothing to address Ms. Carter's complaints or investigate the issues she raised in her December 2019 email.  For example, Defendant Scott has not exercised his power to remove the BPD Commissioner in order to prevent the ongoing unconstitutional searches, seizures and destruction of property by BPD Officers, and has continued to advocate for funding cuts to this critical service.  *See Baltimore City Fiscal 2022 Preliminary Budget* at 136, (available at: https://tinyurl.com/y9skewwj).

73.    The investigation into who shot and ultimately killed Ms. Carter's son is not closed.  On June 2, 2021, the United States Attorney's Office for the District of Maryland unsealed an indictment naming Mr. Correy Cawthorn as Mr. Cheek's killer.  However, other than the cash Mr. Cheeks's had on him when he was shot—BPD has returned none of Ms. Carter's son's property to her, or what is left of it that BPD has not yet destroyed.

### B.    BPD's relevant search and seizure policies are unconstitutional.

#### 1.    *BPD Policy 1401 is unconstitutional as written and as applied*

74.    BPD policy 1401, *Control of Property and Evidence*, dated March 19, 2018, ("BPD Policy 1401") is a 34-page policy document implemented by order of the BPD Commissioner that applies to all BPD officers and employees.  (BPD Policy 1401 at 18).  BPD Policy 1401 governs the seizure, control, and disposition of the Subject Property.  Though the U.S. Constitution permits only reasonable searches and seizures of property and provides standards by which that is to be assessed, BPD Policy 1401 lacks any reasonableness requirements or any other constitutional standards.  BPD Policy 1401 fails to define what constitutes a reasonable search and seizure or "evidentiary value."  In fact, BPD Policy 1401—as written and as applied—violates the constitutional reasonableness requirement.

75.    BPD Policy 1401 on its face distinguishes between "evidentiary" and "non-evidentiary" property but fails to define this distinction.  (BPD Policy 1401 at 5, mandating only

that "evidentiary property" be held until completion of the case; and BPD Policy 1401 at 6, instructing that "[n]on-evidentiary property belonging to a victim shall be returned").

76.      Plaintiffs asked BPD to return the Subject Property, including certain articles of clothing, cell phones, currency, car and house keys, a wristwatch, a lottery ticket, debit/credit cards, photo identification including a driver's license, and a wallet.  Instead of returning the Subject Property or attempting to determine what property had "evidentiary value" and what property was non-evidentiary, BPD simply retained or destroyed the Subject Property.  Indeed, in at least one instance involving Plaintiff Cottman's property, Defendant Macklin acknowledged that the property should be released because the underlying case had reached a disposition, however Defendant Macklin stated that she was unable to effect the return until she cleared it with her sergeant.  Plaintiff Cottman's property remains in BPD custody.  In Ms. Carter's case, BPD clearly determined some of her son's property as having no evidentiary value, but instead of returning it to her, BPD destroyed it without first providing notice, and even after receiving multiple requests from Ms. Carter to return her son's property to her as next of kin.

77.      BPD's nonconsensual and warrantless searches, its indiscriminate seizure of the Subject Property, its refusal to return the Subject Property, and its unlawful destruction of the Subject Property demonstrates its failure to apply a reasonableness standard to its searches and seizures.

78.      BPD seized approximately $400 in U.S. currency from Ms. Spencer.  BPD policy 1401 requires BPD officers and employees immediately to return currency taken from a victim.  (*See* BPD Policy 1401 at 9).  There is no evidence connecting Ms. Spencer's money to any crime.  There is no apparent constitutional basis for its seizure.  The sole basis appears to be BPD's unconstitutional authorization.  BPD is capable of releasing currency to its rightful

claimant; it just chooses not to.  Albeit 18-months after the seizure, BPD ultimately released to Ms. Carter the $435 in U.S. currency seized from Ms. Carter's son at the time of the shooting. But as BPD's customs, policies, and practices demonstrate, Ms. Spencer's experience is the rule and Ms. Carter's is the exception.

79.     BPD also has failed to afford Plaintiffs notice of the seizure of the Subject Property and an opportunity to be heard on the question of whether the property should be retained, returned, or destroyed.  Though BPD Policy 1401 requires that claimants/victims be notified within 90 days when BPD seizes non-evidentiary property from a crime victim and at least 90 days before any seized property is disposed of, Plaintiffs never received such notification. (*See* BPD Policy 1401 at 5-6).  BPD Policy 1401 also requires BPD to document all submissions of property to BPD's ECU via a Property Receipt incorporated in BPD Form 56. (*See* BPD Policy 1401 at 7).  Plaintiffs have not received copies of Form 56.

80.     BPD Form 56 provides that, upon written request for the return of seized property, BPD will make a determination regarding the return of the property within 60 days. (*See* BPD Policy 1401 at 19).  Despite requesting the return of seized property in writing, BPD has not provided Plaintiffs with any determination regarding the return of the Subject Property.

### 2.     *BPD Policy 703 is unconstitutional as written and as applied*

81.     BPD Policy 703, *Death and Serious Assault Investigations*, dated September 13, 2017, ("BPD Policy 703") is a six-page policy document implemented by order of the Police Commissioner that applies to all BPD officers and employees and governs the seizure, control, and disposition of property.  (*See* BPD Policy 703 at 6).

82.     BPD Policy 703 requires BPD officers accompanying a victim to the hospital to "[t]ake possession of the clothing of the victim and all available evidence." (BPD Policy 703 at 4).  Though BPD Policy 703 uses the word "evidence," it does not require any probable cause or

reasonableness determination prior to the seizure of a victim's property and makes no meaningful distinction between property with evidentiary value and property without it.  In practice, BPD officers who accompany a victim to the hospital search and seize the victim's clothing and all available *property*.  BPD officers conducting these blanket searches and seizures unreasonably took non-evidentiary Subject Property.

83.     These unreasonable searches and seizures are conducted with the authority and under the supervision of BPD's Homicide Section, Criminal Investigations Bureau (CIB), the Citywide Shooting Unit (CWS), and the District Detective Unit (DDU), CIB.  (*See* BPD Policy 703 at 1-2).  These unreasonable searches and seizures also are conducted under the supervision of BPD Sector Supervisors and Shift Commanders including Defendants Ross and Walrath. (*See* BPD Policy 703 at 4).

### C.     BPD's customs, practices, or usages of searching and seizing the Subject Property are unconstitutional.

84.     As described above, BPD, the Supervisory Defendants, and the Officer Defendants by custom or practice failed to exercise proper judgment to determine whether searches and seizures of crime victims' property are reasonable.  Instead, BPD's widespread custom and practice is to seize all available property from victims of serious assaults and categorize it as "evidence" regardless of the reasonableness of the seizure and/or search.

85.     BPD's custom or practice of engaging in blanket seizures and categorical characterizations of property seized from crime victims violates Plaintiffs' right to be free of unreasonable searches and seizures and the recovery of property whether or not it was properly seized initially.

86.     Even where BPD attempts to distinguish between "evidence" and "property" as in Ms. Cottman's and Ms. Carter's cases, BPD failed to return the property in accordance with its own written policies, as well as the laws of the State of Maryland, and the U.S. Constitution.

87.     This improper conduct is and was at all times relevant herein expressly and implicitly condoned and sanctioned by BPD, the BPD Commissioners, and the Baltimore City Mayor.  It has occurred enough times that BPD, BPD Commissioners, and the Baltimore City Mayor knew or should have known of this widespread custom, policy, practice or usage. Furthermore, Ms. Carter placed Defendant Scott, Councilman Stokes, the City Council, BPD, the Supervisory Defendants, the Officer Defendants, Defendant Dressler, Defendant Walrath, Defendant Ross, and Defendant O'Connor on actual notice of the violations as evidenced by written and verbal communications between Ms. Carter and the Defendants during the relevant time frame.

### D.      BPD's failure to adequately train, supervise, and discipline its members is an unconstitutional custom, practice, or usage.

88.     BPD has an obligation to train, supervise, and discipline its officers/employees to ensure that those officers/employees conduct lawful searches and seizures.  BPD assured a court in this District that it would adequately train its officers to conduct lawful searches and seizures. BPD assured a court in this District that it would ensure that a supervising officer reviews all documentation and records relating to searches and seizures for completeness and adherence to the law and BPD policy.  BPD assured a court in this District that it would audit the supervisory reviews of documentation and records relating to searches and seizures.

89.     Despite these assurances, and despite the fact that the Baltimore City Mayor, BPD, the BPD Commissioners, and the Supervisory Defendants knew or should have known that BPD implemented unconstitutional policies of searching and seizing crime victims' property, the

Baltimore City Mayor, BPD, the BPD Commissioners, the Supervisory Defendants, Defendant Scott, Defendant Dressler, Defendant Walrath, and Defendant Ross failed to take action to ensure that BPD's unconstitutional policies were corrected and that BPD's officers and employees were adequately trained.

90.     Despite BPD's written assurances and despite the fact that the Baltimore City Mayor, BPD, the BPD Commissioners, and the Supervisory Defendants knew or should have known that BPD officers and employees were engaged in unconstitutional policies, practices, customs, or usages of searching, seizing, and destroying property of crime victims, Defendants failed to adequately train, supervise, or discipline BPD officers/employees who were so engaged.

91.     The Baltimore City Mayors, BPD, the BPD Commissioners, and the Supervisory Defendants likewise knew or should have known that the training provided to BPD officers and employees was so inadequate that it would lead to further violations of members of the Plaintiff Class's and Subclasses' civil rights.  Their failure to provide adequate training in the face of the ongoing nature of these violations, and in spite of receiving written complaints, demonstrates their deliberate indifference to the harm done to members of the Plaintiff Classes.

92.     These failures show that BPD does not ensure that supervising officers review all documentation and records relating to searches and seizures for completeness and adherence to the law and BPD policy.  Such failures also show that, on information and belief, BPD has not audited the documentation and record-keeping procedures relating to searches and seizures that require periodic supervisory review.

93.     These failures also show that BPD does not adequately notify property claimants of their rights as required by law.  In spite of possessing correct contact information for property claimants, BPD sends official correspondence to outdated addresses, and some or all of the

required notice period preceding the disposal of property is consumed by BPD's own inability to mail correspondence in a timely manner.

94.     BPD's Public Integrity Bureau (PIB) was established for the purpose of investigating allegations of misconduct by members of the Department, while ensuring that all personnel abide by the rules and regulations governing their conduct.  Defendant Carter twice complained to the PIB of BPD's unconstitutional conduct.  Nonetheless, PIB closed both cases without further action to prevent ongoing violations.  PIB could have notified the Supervisory Defendants, the BPD Commissioners, or the Baltimore City Mayor, but did not.

95.     On information and belief, the PIB has been historically understaffed, faced caseloads of 80 or more per PIB employee, maintained files in disarray, and closed cases based on faulty or insufficiently explained reasoning.  For example, dozens of internal cases alleging misconduct by officers have expired, often on procedural grounds, because the PIB failed to file the complaints in a timely manner.  Some cases were dropped merely because a witness or victim of the misconduct did not follow through with the complaint; this was not uncommon since PIB cases often languished without being properly investigated.  Indeed, Defendant Harrison recently admitted that "much more work [] needs to be done."  Similarly, Deputy Commissioner Brian Nadeau said the Department has a long way to go to ensure that BPD officers are held to the highest standards of integrity.

96.     The findings of the team monitoring BPD pursuant to Judge James K. Bredar's October 2017 order recently found that "40 percent of misconduct investigations in 2018 were of 'fair' or 'poor' overall quality."  Documentation was so poor that even the facts of the cases and the list of investigative steps taken were unclear.  The monitors also found that people filing complaints were interviewed only 41 percent of the time.

97.     The failures the PIB exhibited in this case are systemic; often, investigators do not "flag repetitive problematic behavior, and potential policy shortcomings."  That certainly is the case here.  The monitoring team has concluded that there is "insufficient evidence to show that BPD has begun to erase [the Public Integrity Bureau's] troubled legacy of permissiveness, which has emboldened officers not only to violate policy, but — as with the Gun Trace Task Force — to break the law."

### E.     BPD's continued unconstitutional customs, practices, or usages affected Plaintiffs.

98.     BPD's constitutional violations continue because BPD has not returned the Subject Property.  Due to Defendants' continued unlawful seizure of the Subject Property, Plaintiffs have had to replace the seized Subject Property at their own personal expense.

99.     Based on information and belief, BPD also continues to engage in the conduct alleged in this Complaint.  For example, according to BPD's website, training materials provided to BPD active duty members in 2020 in connection with the "Stops, Searches, and Arrests/Fair & Impartial Police Training Curriculum," which includes a lesson plan and presentation on how to manage a crime scene, makes no reference to BPD Policy 703 or 1401. *See* https://www.baltimorepolice.org/stops-searches-and-arrestsfair-impartial-policing-training-curriculum (PDF available at: https://tinyurl.com/ypw7nuk4).

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*Facial Challenge to BPD Policies 703 and 1401 under 42 U.S.C. § 1983 and the*
*Fourth and Fourteenth Amendments to the U.S. Constitution*

100.     Plaintiffs incorporate paragraphs 1 through 99 as if they were fully stated herein.

101.     Plaintiffs, on behalf of themselves and all Plaintiff Class Members and Subclass Members, bring this claim against BPD and the BPD Commissioners, in their official and

individual capacities, for implementing policies that are unconstitutional on their face as violative of the Fourth and Fourteenth Amendments to the U.S. Constitution.

102.    Defendants BPD and the BPD Commissioners deprived Plaintiffs of their Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures of their property by developing and implementing unconstitutional BPD policies that fail to distinguish between "property" and "evidence" in the context of property seized from victims of serious assaults in the immediate aftermath of a traumatic experience.

103.    Defendants Converse, DiPasquale, and Macklin intentionally searched and seized the Subject Property pursuant to and under the authority of BPD Policies 703 and 1401.

104.    The search and seizures were unreasonable.

105.    The search and seizures were conducted without a search warrant.

106.    The search and seizures were conducted without Plaintiffs' consent.

107.    BPD continues to retain possession of Plaintiff Spencer's and the Continuing Seizure Subclass Members' property pursuant to and under the authority of BPD Policies 703 and 1401.

108.    BPD Policies 703 and 1401 fail to distinguish between personal property and property seized as evidence of an underlying crime.

109.    At the time of the unreasonable searches and seizures, the BPD Commissioners encouraged or directly participated in the unreasonable search and seizures by officially authorizing, approving, or knowingly going along with BPD Policies 703 and 1401.

110.    Defendant BPD implemented Policies 703 and 1401.

111.    BPD Policies 703 and 1401 caused the Officer Defendants to engage in conduct that deprived Plaintiffs of their rights; that is, BPD Policies 703 and 1401 authorized the Officer

Defendants to unreasonably search and seize property from victims of serious assaults without regard to the evidentiary characteristics or lack thereof of the property being seized, thereby depriving Plaintiffs' of their civil rights.

112.    This deprivation of rights caused Plaintiffs harm, including lost wages due to lost time at work, the lost value of the property unlawfully seized, emotional distress, personal humiliation, and the deprivation of the use of the property unreasonably taken.

**SECOND CAUSE OF ACTION**
*Challenging the Unreasonable Search of Plaintiff Cottman's*
*and the Illegal Phone Search Subclass's Phones Under 42 U.S.C. § 1983*
*and the Fourth and Fourteenth Amendments to the U.S. Constitution*

113.    Plaintiffs incorporate paragraphs 1 through 99 as if they were fully stated herein.

114.    Plaintiff Cottman, on behalf of herself and the Illegal Phone Search Subclass Members, bring this claim against the following defendants in their official and individual capacities: the BPD Commissioners, the Officer Defendants, and the Supervisory Defendants.

115.    Defendants the BPD Commissioners, the Officer Defendants, and the Supervisory Defendants performed acts that deprived Plaintiff Cottman and the Illegal Phone Search Subclass Members of their Fourth and Fourteenth Amendment rights to be free from unreasonable searches of their property.

116.    Defendant Macklin intentionally searched the contents of Plaintiff Cottman's phone pursuant to and under the authority of BPD Policies 703 and 1401.

117.    The search was unreasonable.

118.    The search was conducted without a search warrant.

119.    The search was conducted without consent.

120. At the time of the unreasonable searches and seizures, the BPD Commissioners encouraged or directly participated in the unreasonable search and seizures by officially authorizing, approving, or knowingly going along with BPD Policies 703 and 1401.

121. Defendant Macklin and the Officer Defendants conducted such searches under the supervision and oversight of the BPD Commissioners, who implemented, followed, or failed to remedy customs, practices, or usages of conducting such searches.

122. At the time of these searches, Defendants acted under color of law as BPD officials and officials of the City of Baltimore.

123. By unlawfully searching Plaintiff Cottman's and the Illegal Phone Search Subclass's phones without consent or first obtaining a lawfully issued search warrant, Defendants violated Plaintiff Cottman's and the Illegal Phone Search Subclasses' right to be secure in their persons and property from unreasonable searches.

124. As a proximate and foreseeable result of Defendants' violations, Plaintiff Cottman and the Illegal Phone Search Subclass Members have suffered, are suffering, and will continue to suffer injuries including emotional distress and personal humiliation.

### THIRD CAUSE OF ACTION
*Challenging the Unreasonable Seizure of the Subject Property*
*Under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the U.S. Constitution*

125. Plaintiffs incorporate paragraphs 1 through 99 as if they were fully stated herein.

126. Plaintiffs on behalf of themselves and all Plaintiff Class Members and Subclass Members bring this claim against the following defendants in their individual and official capacities: the BPD Commissioners, the Officer Defendants, and the Supervisory Defendants.

127. Defendants the BPD Commissioners, the Officer Defendants, and the Supervisory Defendants performed acts that deprived Plaintiffs of their Fourth and Fourteenth Amendment rights to be free from unreasonable seizures of their property.

128.     Defendants Converse, DiPasquale, Macklin, O'Connor, Ross, Walrath, and Dressler intentionally seized the Subject Property.

129.     The seizures were unreasonable.

130.     The seizures were made without a search warrant.

131.     The seizures were not pursuant to Plaintiffs' arrest.

132.     The seizures were made without Plaintiffs' consent.

133.     At the time of the unreasonable search and seizures, the BPD Commissioners encouraged or directly participated in the unreasonable search and seizures by officially authorizing, approving, or knowingly going along with BPD Policies 703 and 1401.

134.     Defendants Converse, DiPasquale, Macklin, O'Connor, Ross, Walrath, Dressler, and the other Officer Defendants made such seizures under the supervision and oversight of the BPD Commissioners, who implemented, followed, or failed to remedy customs, practices, or usages of making such seizures.

135.     At the time of these seizures, Defendants were acting under color of law as BPD officials and officials of the City of Baltimore.

136.     As a proximate and foreseeable result of Defendants' violations of Plaintiffs' Fourth and Fourteenth Amendment rights, Plaintiffs have suffered, are suffering, and will continue to suffer injuries including the loss of the use and enjoyment of the Subject Property, the loss of the property itself, emotional distress, personal humiliation, and any costs in connection with replacing the seized property at personal expense.

**FOURTH CAUSE OF ACTION**
*Challenging BPD's Custom, Practice, or Usage of Conducting Unreasonable Searches and Seizures of Crime Victims' Property Under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the U.S. Constitution*

137.     Plaintiffs incorporate paragraphs 1 through 99 as if they were fully stated herein.

138.    Plaintiffs on behalf of themselves and all Plaintiff Class Members and Subclass Members bring this claim against BPD, and the BPD Commissioners, in their individual and official capacities.

139.    Defendants BPD and the BPD Commissioners, in their individual and official capacities, performed acts that deprived Plaintiffs of their Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures of the Subject Property.

140.    The practice of conducting unreasonable searches and seizures was, at the time Plaintiffs were deprived of their rights, a longstanding, widespread, or well-settled custom that constituted a standard operating procedure of BPD.

141.    Defendants were, at the time of the unreasonable search and seizures, officials of the City of Baltimore.

142.    Defendants Converse, DiPasquale, and Macklin intentionally searched and seized the Subject Property pursuant to this custom, practice, or usage.

143.    The search and seizures were unreasonable.

144.    The search and seizures were conducted without a search warrant.

145.    The search and seizures were conducted without Plaintiffs' consent.

146.    At the time of the unreasonable search and seizures, the BPD Commissioners encouraged or directly participated in the unreasonable search by officially authorizing, approving, or knowingly going along with the unconstitutional custom, practice, or usage of the individual police officers who conducted the unreasonable search and seizures.

147.    The BPD Commissioners condoned unconstitutional customs, practices, and usages, or knowingly refused to terminate the ongoing series of unreasonable search and seizures conducted by BPD officers.

- 37 -

148.    Defendants' widespread and/or longstanding practice, custom, or usage caused the deprivation of the Plaintiffs' rights by the Officer Defendants; that is, BPD's widespread or longstanding practice or custom caused the deprivation of Plaintiffs' constitutional rights.

149.    This deprivation of rights caused Plaintiffs harm, including lost wages due to lost working time, the lost value of the property unlawfully seized, emotional distress, personal humiliation, and the deprivation of the use of the property unreasonably taken.

### FIFTH CAUSE OF ACTION
*Challenging BPD's Failure to Train on the Proper Conduct of Searches and Seizures Under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the U.S. Constitution*

150.    Plaintiffs incorporate paragraphs 1 through 99 as if they were fully stated herein.

151.    Plaintiffs bring this claim on behalf of themselves and all Plaintiff Class Members and Subclass Members against BPD, and the BPD Commissioners and Supervisory Defendants, in their individual and official capacities.

152.    Defendants BPD, the BPD Commissioners, and the Supervisory Defendants performed acts that deprived Plaintiffs of their Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures of the Subject Property.

153.    Defendants BPD and the BPD Commissioners' training program was inadequate to train its officers and employees to carry out their duties in this respect.

154.    The Supervisory Defendants failed to conduct sufficient training to ensure that BPD's officers and employees refrain from conducting unreasonable searches and seizures.

155.    Defendants BPD, the BPD Commissioners, and the Supervisory Defendants knew that BPD officers and employees would confront situations in which they needed to assess the evidentiary value of crime victims' property for purposes of conducting lawful searches and seizures.

156.    BPD officers have a long history of mishandling searches and seizures.

157.     Defendants BPD, the BPD Commissioners, and the Supervisory Defendants knew that BPD officers who wrongly decided to search and/or seize crime victims' property would frequently cause a deprivation of crime victims' Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures.

158.     Despite this knowledge, Defendants BPD, the BPD Commissioners, and the Supervisory Defendants were deliberately indifferent to the need for more or different training.

159.     Without proper training, Defendants Converse, DiPasquale, and Macklin intentionally searched and seized the Subject Property.

160.     The search and seizures were unreasonable.

161.     The search and seizures were conducted without a search warrant.

162.     The search and seizures were conducted without Plaintiffs' consent.

163.     Defendants' failure to properly train BPD officers and employees caused the deprivation of the Plaintiffs' rights by the Officer Defendants; that is, Defendants BPD, the BPD Commissioners, and the Supervisory Defendants' failure to properly train BPD officers and employees caused the deprivation of Plaintiffs' rights.

164.     This deprivation of rights caused Plaintiffs harm, including lost wages due to lost working time, the lost value of the property unlawfully seized, emotional distress, personal humiliation, and the deprivation of the use of the property unreasonably taken.

### SIXTH CAUSE OF ACTION
*Challenging BPD's Failure to Supervise the Conduct of Searches and Seizures*
*Under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the U.S. Constitution*

165.     Plaintiffs incorporate paragraphs 1 through 99 as if they were fully stated herein.

166.     Plaintiffs on behalf of themselves and all Plaintiff Class Members and Subclass Members bring this claim against BPD, and in their individual and official capacities, the BPD Commissioners and the Supervisory Defendants.

167.    Defendants BPD, the BPD Commissioners, and the Supervisory Defendants performed acts that deprived Plaintiffs of their Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures.

168.    Defendants BPD, and the BPD Commissioners' program of supervision was inadequate to ensure that BPD officers and employees were adequately trained to carry out their duties in this respect.

169.    The Supervisory Defendants failed to supervise BPD officers and employees to refrain from conducting unreasonable searches and seizures.

170.    Defendants BPD, the BPD Commissioners, and the Supervisory Defendants knew that BPD officers and employees would confront situations in which they needed to assess the evidentiary value of crime victims' property for purposes of conducting lawful searches and seizures.

171.    BPD officers have a long history of mishandling searches and seizures.

172.    Defendants BPD, the BPD Commissioners, and the Supervisory Defendants knew that BPD officers who wrongly decided to search and/or seize crime victims' property would frequently cause a deprivation of crime victims' Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures.

173.    Despite this knowledge, Defendants BPD, the BPD Commissioners, and the Supervisory Defendants were deliberately indifferent to the need to adequately supervise BPD officers and employees responsible for evaluating the evidentiary value of seized property.

174.    Defendants Converse, DiPasquale, and Macklin without adequate training, intentionally searched and seized the Subject Property.

175.    The search and seizures were unreasonable.

176.    The search and seizures were conducted without a search warrant.

177.    The search and seizures were conducted without Plaintiffs' consent.

178.    Defendants' failure to adequately supervise BPD officers and employees caused the deprivation of the Plaintiffs' rights by the Officer Defendants; that is, Defendants BPD, the BPD Commissioners, and the Supervisory Defendants' failure to adequately supervise BPD officers and employees caused the deprivation of Plaintiffs' rights.

179.    This deprivation of rights caused Plaintiffs harm, including lost wages due to lost working time, the lost value of the property unlawfully seized, emotional distress, personal humiliation, and the deprivation of the use of the property unreasonably taken.

### SEVENTH CAUSE OF ACTION
*Challenging Defendants' Custom, Practice, or Usage of Failing to Provide Plaintiffs Adequate Notice and Opportunity to be Heard Under of 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the U.S. Constitution*

180.    Plaintiffs incorporate paragraphs 1 through 99 as if they were fully stated herein.

181.    Plaintiff Spencer on behalf of herself and all Continuing Seizure Subclass and Currency Seizure Subclass Members and Plaintiff Carter on behalf of herself and all Property Destruction Subclass Members bring this claim against BPD, and in their individual and official capacities, the BPD Commissioners and the Supervisory Defendants.

182.    Defendants BPD, the BPD Commissioners, and the Supervisory Defendants performed acts that deprived Plaintiffs of their Fifth and Fourteenth Amendment rights to be free from deprivation of property without due process of law.

183.    Defendants BPD and the BPD Commissioners have implemented procedures that purport to protect the rightful claimants of property seized from crime victims from the mistaken or unjustified deprivation of property.

184.    Plaintiffs have attempted to avail themselves of these procedures.

185.     The Supervisory Defendants are empowered to and responsible for carrying out these procedures in a manner that protects the rights of property claimants.

186.     Defendants have denied Plaintiffs all meaningful access to the protection of rights these procedures purport to provide.

187.     The practice of denying the Continuing Seizure Subclass Members, the Currency Seizure Subclass Members, and the Property Destruction Subclass Members adequate notice and opportunity to seek the return of seized property was, at the time Plaintiffs were deprived of their rights, a longstanding, widespread, or well-settled custom that constituted a standard operating procedure of BPD.

188.     Defendants were, at the time of the due process violations, officials of the City of Baltimore.

189.     At the time of the due process violations, the BPD Commissioners and the Supervisory Defendants encouraged or directly participated in the violations by officially authorizing, approving, or knowingly going along with the unconstitutional custom, practice, or usage of the individual police officers who conducted the unreasonable search and seizures.

190.     The BPD Commissioners condoned unconstitutional customs, practices, and usages, or knowingly refused to terminate the ongoing series of due process violations by BPD officers.

191.     Defendants' widespread or longstanding practice, custom, or usage caused the deprivation of the Plaintiffs' rights by the Supervisory Defendants and Officer Defendants; that is, BPD's widespread or longstanding practice or custom caused the deprivation of Plaintiffs' rights.

192.     This deprivation of rights caused Plaintiffs harm, including lost working time, the

lost value of the property unlawfully seized, emotional distress, personal humiliation, and the

deprivation of the use of the property unreasonably taken.

**EIGHTH CAUSE OF ACTION**
*Challenging BPD's Failure to Train to Provide Adequate*
*Notice and Opportunity to be Heard Under of 42 U.S.C. § 1983 and the*
*Fifth and Fourteenth Amendments to the U.S. Constitution*

193.     Plaintiffs incorporate paragraphs 1 through 99 as if they were fully stated herein.

194.     Plaintiff Spencer on behalf of herself and all Continuing Seizure Subclass and

Currency Seizure Subclass Members and Plaintiff Carter on behalf of herself and all Property

Destruction Subclass Members bring this claim against BPD, and in their individual and official

capacities, the BPD Commissioners and the Supervisory Defendants.

195.     Defendants BPD, the BPD Commissioners, and the Supervisory Defendants

performed acts that deprived Plaintiffs of their Fifth and Fourteenth Amendment procedural due

process rights to be free from deprivation of property without notice and opportunity to be heard.

196.     Defendants BPD's and the BPD Commissioners' training program was

inadequate to train BPD's officers and employees to carry out their duties in this respect.

197.     The Supervisory Defendants failed to conduct sufficient training to ensure that its

officers and employees refrain from depriving the Continuing Seizure Subclass Members, the

Currency Seizure Subclass Members, and the Property Destruction Subclass Members of their

right to notice and an opportunity to be heard.  And the Supervisory Defendants authorized and

failed to prevent the destruction of the Property Destruction Subclass Members' property without

legal justification.

198.     Defendants BPD, the BPD Commissioners, and the Supervisory Defendants knew

that BPD officers and employees would confront situations in which they would be responsible

for ensuring that the Continuing Seizure Subclass Members, the Currency Seizure Subclass Members, the Property Destruction Subclass Members, and similarly situated claimants received procedural due process rights.

199.    BPD officers have a long history of due process violations.

200.    Defendants BPD, the BPD Commissioners, and the Supervisory Defendants knew that the wrong choice by BPD officers faced with choices about crime victims' rights to notice and an opportunity to be heard would frequently cause a deprivation of the Continuing Seizure Subclass Members', the Currency Seizure Subclass Members', the Property Destruction Subclass Members', and similarly situated claimants' Fifth Amendment and Fourteenth Amendment due process rights.

201.    Despite this knowledge, Defendants BPD, the BPD Commissioners, and the Supervisory Defendants were deliberately indifferent to the need for more or different training.

202.    Defendants Converse, DiPasquale, Macklin, O'Connor, Ross, Walrath, and Dressler without proper training, failed to provide notice and an opportunity for Plaintiffs to seek the return of the Subject Property.

203.    Defendants' failure to properly train BPD officers and employees caused the deprivation of the Plaintiffs' rights by the Officer Defendants; that is, Defendants BPD, the BPD Commissioners, and the Supervisory Defendants' failure to properly train BPD members caused the deprivation of Plaintiffs' rights.

204.    This deprivation of rights caused Plaintiffs harm, including lost wages due to lost working time, the lost value of the property unlawfully seized, emotional distress, personal humiliation, and the deprivation of the use of the property unreasonably taken.

**NINTH CAUSE OF ACTION**

*Challenging BPD's Failure to Supervise the Provision of Adequate
Notice and Opportunity to be Heard Under of 42 U.S.C. § 1983 and the
Fifth and Fourteenth Amendments to the U.S. Constitution*

205.    Plaintiffs incorporate paragraphs 1 through 99 as if they were fully stated herein.

206.    Plaintiff Spencer on behalf of herself and all Continuing Seizure Subclass and
Currency Seizure Subclass Members and Plaintiff Carter on behalf of herself and all Property
Destruction Subclass Members bring this claim against BPD, and in their individual and official
capacities, the BPD Commissioners and the Supervisory Defendants.

207.    Defendants BPD, the BPD Commissioners, and the Supervisory Defendants
performed acts that deprived Plaintiffs of their Fifth and Fourteenth Amendment procedural due
process rights to be free from deprivation of property without notice and opportunity to be heard.

208.    Defendants BPD's and the BPD Commissioners' program of supervision was
inadequate to ensure that its officers and employees properly carried out their duties in this
respect.

209.    The Supervisory Defendants failed to exercise supervision to ensure that BPD
officers and employees refrained from depriving the Continuing Seizure Subclass Members, the
Currency Seizure Subclass Members, and the Property Destruction Subclass Members of their
right to notice and an opportunity to be heard.

210.    Defendants BPD, the BPD Commissioners, and the Supervisory Defendants knew
that BPD officers and employees would confront situations in which they would be responsible
for ensuring that the Continuing Seizure Subclass Members, the Currency Seizure Subclass
Members, the Property Destruction Subclass Members, and similarly situated claimants received
procedural due process rights.

211.    BPD officers have a long history of due process violations.

212.    Defendants BPD, the BPD Commissioners, and the Supervisory Defendants knew that BPD officers who wrongly decided to search and/or seize crime victims' property would frequently cause a deprivation of the Continuing Seizure Subclass Members', the Currency Seizure Subclass Members', the Property Destruction Subclass Members', and similarly situated claimants' Fifth and Fourteenth Amendment due process rights.

213.    Despite this knowledge, Defendants BPD, the BPD Commissioners, and the Supervisory Defendants were deliberately indifferent to the need for close supervision.

214.    Defendants Converse, DiPasquale, Macklin, O'Connor, Ross, Walrath, and Dressler without proper training, failed to provide notice and an opportunity for Plaintiffs to seek the return of the Subject Property.

215.    Defendants' failure to adequately supervise BPD officers and employees caused the deprivation of the Plaintiffs' rights by the Officer Defendants; that is, BPD, the BPD Commissioners, and the Supervisory Defendants' failure to adequately supervise BPD officers and employees caused the deprivation of Plaintiffs' rights.

216.    This deprivation of rights caused Plaintiffs harm, including lost wages due to lost working time, the lost value of the property unlawfully seized, emotional distress, personal humiliation, and the deprivation of the use of the property unreasonably taken.

### TENTH CAUSE OF ACTION
*Challenging Defendant Scott's Condonation of BPD's Custom, Practice, or Usage of Conducting Unreasonable Searches and Seizures of—and of Unlawfully Destroying—Crime Victims' Property Under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the U.S. Constitution*

217.    Plaintiffs incorporate paragraphs 1 through 99 as if they were fully stated herein.

218.    Plaintiffs on behalf of themselves and all Plaintiff Class Members and Subclass Members bring this claim against Defendant Scott in his official capacity.

219.     Defendant Scott performed acts that deprived Plaintiffs of their Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures of the Subject Property.

220.     The practice of conducting unreasonable searches and seizures and of unlawfully destroying crime victims' property was, at the time Plaintiffs were deprived of their rights, a longstanding, widespread, or well-settled custom that constituted a standard operating procedure of BPD.

221.     Defendant Scott was, at the time of the ongoing violations, an official of the City of Baltimore.

222.     As of at least December 2019, Defendant Scott had actual notice of these widespread constitutional violations.

223.     Defendant Scott was and is empowered to stop this widespread pattern of constitutional violations by removing the BPD Commissioner and appointing a new BPD Commissioner who would correct the violations.

224.     Defendant Scott failed to put a stop to or correct this widespread pattern of unconstitutional conduct.

225.     By his failure, Defendant Scott condoned unconstitutional customs, practices, and usages, or knowingly refused to terminate the ongoing series of constitutional violations.

226.     This condonation caused Defendants' widespread and/or longstanding practice of depriving Plaintiffs of their constitutional rights to continue.

227.     This deprivation of rights caused Plaintiffs harm, including lost wages due to lost working time, the lost value of the property unlawfully seized, emotional distress, personal humiliation, and the deprivation of the use of the property unreasonably taken.

**ELEVENTH CAUSE OF ACTION**

*Challenging Defendant Scott's Condonation of Defendants' Custom, Practice, or Usage of Failing to Provide Plaintiffs Adequate Notice and Opportunity to be Heard Under of 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the U.S. Constitution*

228.   Plaintiffs incorporate paragraphs 1 through 99 as if they were fully stated herein.

229.   Plaintiffs on behalf of themselves and all Plaintiff Class Members and Subclass Members bring this claim against Defendant Scott in his official capacity.

230.   Defendant Scott performed acts that deprived Plaintiffs of their Fifth and Fourteenth Amendment rights to be free from deprivation of property without due process of law.

231.   Defendant BPD has implemented procedures that purport to protect the rightful claimants of property seized from crime victims from the mistaken or unjustified deprivation of property.

232.   Plaintiffs have attempted to avail themselves of these procedures.

233.   The BPD Commissioners are responsible for ensuring that these procedures are implemented in a manner that protects the rights of property claimants.

234.   Plaintiffs were denied meaningful access to the protection of rights these procedures purport to provide.

235.   The practice of denying the Continuing Seizure Subclass Members, the Currency Seizure Subclass Members, and the Property Destruction Subclass Members adequate notice and opportunity to seek the return of seized property was, by December 2019, a widespread pattern of unconstitutional conduct by BPD, its officers, and the BPD Commissioners.

236.   Defendant Scott was on actual notice of this widespread pattern of unconstitutional conduct as of at least December 2019.

237.    Defendant Scott was and is empowered to stop this widespread pattern of constitutional violations by removing the Police Commissioner and appointing a new BPD Commissioner who would correct the violations.

238.    At all times since December 2019, and at the time of the ongoing due process violations, Defendant Scott was an official of the City of Baltimore.

239.    Defendant Scott failed to put a stop to or correct this widespread pattern of unconstitutional conduct.

240.    By his failure, Defendant Scott condoned unconstitutional customs, practices, and usages, or knowingly refused to terminate the ongoing series of constitutional violations.

241.    This condonation caused Defendants' widespread and/or longstanding practice of depriving Plaintiffs of their constitutional rights to continue.

242.    This deprivation of rights caused Plaintiffs harm, including lost wages due to lost working time, the lost value of the property unlawfully seized, emotional distress, personal humiliation, and the deprivation of the use of the property unreasonably taken.

## JURY DEMAND

243.    Plaintiffs demand a jury trial on all such triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a.      Declare that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure Rule 23 and certify the class with the named Plaintiffs as the class representatives and with current counsel as class counsel;

b.      Declare that Defendants' acts, taken in their official capacities, as alleged above violate the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution;

c.      Declare that Defendants' acts, taken in their individual capacities, as alleged above violate the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution;

d.      Declare that BPD Policies 703 and 1401 are unconstitutional on their face, pursuant to the Fourth and Fourteenth Amendments to the U.S. Constitution;

e.      Declare that BPD Policies 703 and 1401 are unconstitutional as applied, pursuant to the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution;

f.      Permanently enjoin Defendants from pursuing the course of conduct complained of herein;

g.      Enjoin Defendants from engaging in unconstitutional and illegal practices in their official capacities abridging the civil rights of Plaintiffs and others;

h.      Enjoin Defendants from engaging in unconstitutional and illegal practices in their individual capacities abridging the civil rights of Plaintiffs and others;

i.      Order Defendants, BPD officers, agents, and employees to adopt and implement policies, training, accountability systems, and practices to remedy the constitutional and statutory violations described herein;

j.      Order BPD to adopt and implement a policy that adequately defines and distinguishes between evidence and non-evidentiary property;

k.      Order BPD to adopt and implement a procedure that adequately defines the process for collecting an individual's personal property for evidentiary purposes and the process for the return of said property;

l.      Order BPD to adequately train officers on the abovementioned evidentiary policy and procedure;

m.     Order BPD to return any and all of the Subject Property that remains in BPD's

possession and does not actually serve an investigatory purpose as defined by the

aforementioned policy;

n.     Award the individual Plaintiffs compensatory and consequential damages against

Defendants BPD and the Baltimore City Mayor in an amount to be determined by a jury;

o.     Award the individual Plaintiffs compensatory and consequential damages against

the Defendants in their individual capacities in an amount to be determined by a jury;

p.     Award the individual Plaintiffs compensatory and consequential damages against

the Defendants in their official capacities in amount to be determined by a jury;

q.     Award the individual Plaintiffs punitive damages against the BPD

Commissioners, the Officer Defendants, and against the Supervisory Defendants in an amount to

be determined by a jury;

r.     Award the individual Plaintiffs attorneys' fees and costs incurred in bringing this

action pursuant to 42 U.S.C. §§ 1983, 1988; and

s.     Grant such other relief as this Court deems just and proper.

Dated: July 8, 2021                              LAWYERS' COMMITTEE FOR CIVIL
                                                 RIGHTS UNDER LAW

                                                 By: _____/s/_____
                                                 Tianna Mays
                                                 Bar No. 21597
                                                 tmays@lawyerscommittee.org
                                                 Arthur Ago (*pro hac vice*)
                                                 aago@lawyerscommittee.org

                                                 1500 K St. NW Suite 900
                                                 Washington, DC 20005
                                                 Tel (202) 662-8600
                                                 Fax. (202) 783-0857

                                                 *Attorneys for Class Plaintiffs*

Dated: July 8, 2021                    ORRICK, HERRINGTON & SUTCLIFFE
                                       LLP


                                       By: _____/s/_____
                                       Anne C. Malik (*pro hac vice*)
                                       amalik@orrick.com
                                       Nicole Lloret (*pro hac vice*)
                                       nlloret@orrick.com
                                       Matthew Reeder (*pro hac vice*)
                                       mtreeder@orrick.com
                                       Alison Epperson (*pro hac vice*)
                                       aepperson@orrick.com
                                       Olamide Olusesi (*pro hac vice*)
                                       oolusesi@orrick.com

                                       51 West 51st Street
                                       New York, NY 10019
                                       Tel. (212) 506-3659
                                       Fax. (212) 506-5151

                                       *Attorneys for Class Plaintiffs*