IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| FAYE COTTMAN, *et al.*, | * | |
| Plaintiffs | * | |
| v. | * | Case No. 1:21-cv-00837-SAG |
| BALTIMORE POLICE DEPARTMENT, *et al.*, | * | |
| | * | |
| Defendants | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \*

## OFFICER DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO THEIR MOTION TO DISMISS

Defendants Detective Jeffrey A. Converse, Detective Destinee L. Macklin, Lieutenant Scott Dressler, Sergeant Robert Ross, and Detective Ryan O'Connor (together, the "Officer Defendants") submit this Reply to Plaintiffs' Opposition to their Motion to Dismiss (ECF 49).[1]

**I.   ARGUMENT**

    **A.   The Policies at issue are constitutional and Plaintiffs have failed to plausibly allege a cognizable violation.**

The Officer Defendants adopt and incorporate herein the arguments stated in Section I.A of the BPD and related Defendants' Reply in support of their Motion to Dismiss (ECF 52).

    **B.   Plaintiffs have not stated claims for supervisory liability or a failure to train, or "official capacity" claims against the Officer Defendants.**

The Officer Defendants adopt and incorporate herein the arguments stated in Sections I.C and II of the BPD and related Defendants' Reply in support of their Motion to Dismiss (ECF 52).

---

[1]   Lieutenant Mark Walrath and Detective AnnMarie DiPasquale were also named as defendants, but, to date, they have not been served.

As stated in the Officer Defendants' Motion, any training-related claim against the Officer Defendants (including those also named as Supervisory Defendants) is duplicative of the training-related claims asserted against the BPD. The same is true for claims asserted against the Officer Defendants in their official capacity. *See Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) ("The district court correctly held that the § 1983 claim against Martin in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative."). *See also Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

Moreover, as explained in the incorporated portions of the BPD's Reply and in other papers, the policies at issue are constitutional. Even assuming that any of the Officer Defendants supervised a subordinate in a material way or were responsible for or engaged in training in a material way—which would require facts that are not alleged in the Amended Complaint—the Officer Defendants cannot be liable for supervising or training in accordance with a policy that is constitutional. And, Plaintiffs' Opposition does not cure the key factual defect in many of Plaintiffs' claims: the lack of any sufficient factual allegation that any Officer Defendant acted illegally in a supervisory or training capacity. All of these claims should be dismissed.

    **C.**    **Plaintiffs' claims against the Officer Defendants are barred by qualified immunity.**

        **1.**    **Plaintiffs cannot avoid a qualified immunity defense by relying on general propositions instead of any case finding a violation on similar facts.**

Although analyzing a qualified immunity defense requires specificity, Plaintiffs instead rely on generalities. The Supreme Court has made abundantly clear that this is not permissible, including in the cases Plaintiffs cite. Plaintiffs have not identified any violation of any clearly established right, and no such right exists that is applicable to these facts. The Court should find the Officer Defendants are entitled to qualified immunity and grant their motion to dismiss.

As recently as this term, the Supreme Court reiterated the need for specificity in analyzing whether a "clearly established" right exists that is alleged to have been violated:

> We have repeatedly told courts not to define clearly established law at too high a level of generality. See, *e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). It is not enough that a rule be suggested by then-existing precedent; the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Wesby*, 583 U. S., at ——, 138 S.Ct., at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Such specificity is "especially important in the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (*per curiam*) (internal quotation marks omitted).

*City of Tahlequah, Oklahoma v. Bond*, ___ U.S. ___, 142 S. Ct. 9, 11-12 (2021) (per curiam). The Court therefore reversed the Tenth Circuit's reversal of summary judgment in favor of the defendant officers, because:

> Neither the panel majority nor the respondent has identified a single precedent finding a Fourth Amendment violation under similar circumstances. The officers were thus entitled to qualified immunity.

*Id.* at 12.

This is consistent with the Court's prior cases. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft*, 563 U.S. at 742 (reversing denial of qualified immunity and remanding for further analysis). As the Court earlier explained:

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how

> unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow* [*v. Fitzgerald*, 457 U.S. 800 (1982)]. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Davis* [*v. Scherer,* 468 U.S. 183, 195 (1984)]. It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell* [*v. Forsyth,* 472 U.S. 511, 535, n. 12 (1985)]; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987) (footnote and some citations omitted).

Plaintiffs nevertheless fail to identify a single case with facts remotely like the allegations in this case, much less a "single precedent finding a Fourth Amendment violation under similar circumstances." *See City of Tahlequah*, 142 S. Ct. at 12. Instead, they rely only on the abstract, general propositions that the Supreme Court has made clear are insufficient.

None of the cases Plaintiffs cite deals with the types of violations alleged in their Amended Complaint: searches or seizures of personal property that may be evidence in accordance with a departmental policy from the person or vicinity of victims of serious assaults. Even the cases concerning cell phone searches, which Plaintiffs clearly believe most on point, focused on something different: the search of a cell phone seized from an arrestee during a

search incident to arrest.  *Riley v. California*, 573 U.S. 373, 382 (2014) ("The two cases before us concern the reasonableness of a warrantless search incident to a lawful arrest."); *Carpenter v. United States*, 138 S. Ct. 2206, 2214 (2018) (simply restating rule from *Riley*).  The cases Plaintiffs cite on allegedly unreasonable length of seizures deal with whether drug testing or sniffing of packages or luggage was reasonable, *United States v. Jacobsen*, 466 U.S. 109 (1984); *United States v. Place*, 462 U.S. 696 (1983), which also is not at issue here.  And, in *Camara v. Mun. Ct. of City & Cty. of San Francisco*, 387 U.S. 523, 530-31 (1967), the Court declined to distinguish between constitutional protections afforded citizens suspected of crime and law-abiding citizens, but it did so in the context of a search of an apartment home by a city inspector enforcing municipal code violations, not the search or seizure of crime victims' property at crime scenes or hospitals.  In a different context still (whether a warrant could be issued to search a newspaper's office), but in a case Plaintiffs cite, the Court confirmed that those not suspected of crime have no greater rights than suspects.  *Zurcher v. Stanford Daily*, 436 U.S. 547, 559 (1978) ("it is untenable to conclude that property may not be searched unless its occupant is reasonably suspected of crime and is subject to arrest").[2]

      The near complete lack of facts pled in the Amended Complaint regarding the circumstances of the alleged searches and seizures prevents full analysis as to what legal doctrines may have governed the Officer Defendants' conduct, including whether their conduct was even subject to the warrant clause of the Fourth Amendment, whether any particular exception might apply, or whether the inventory search doctrine (which, as explained below, operates independently of probable cause) or some other similar doctrine may apply instead.  That the Officer Defendants appear to have acted in a wide range of differing factual

---

[2]    The facts of another case Plaintiffs cite are even further afield.  *Winston v. Lee*, 470 U.S. 753 (1985) (proposed compelled surgical removal of bullet from suspect's chest).

circumstances is only a reason why the facial challenges (and class action) Plaintiffs attempt to mount here are unworkable.

But, it bears noting that, in the only case with remotely similar facts that the parties have located—in that it involved a victim's property—the Fourth Circuit found no relevant violation and instead found that the seizure and subsequent search of a gunshot victim's clothing from a plastic bag in a hospital room was lawful because they were in plain view and appeared to be "evidence of a crime." *United States v. Davis*, 690 F.3d 226, 233-38 (4th Cir. 2012). Contrary to Plaintiffs' reliance here on the notion that crime victims have an "unimpaired" expectation of privacy, the Fourth Circuit actually determined that a victim's "expectation of privacy was not implicated merely by an effort to identify, describe and catalogue his clothing as evidence of a reported crime, rather than testing anything found on it." *Id.* at 239. The Fourth Circuit in fact distinguished an out-of-circuit state decision disapproving of the search of the effects of an unconscious suspect (as opposed to a victim), and even pointed to other cases finding gunshot victims had no expectation of privacy in their clothing or personal effects. *Id.* at 237 & n.19. And, although the victim retained an expectation of privacy in his DNA, which was ultimately used as evidence in his subsequent prosecution for an unrelated crime several years later, the court considered as part of its analysis "the fact that Davis' expectation of privacy may have been diminished to some degree because Davis knew that the police had retained his clothing, yet had taken no action to retrieve his personal effects following his release." *Id.* at 248.

The court ultimately concluded that the extraction and testing of a DNA profile from a sample collected from Davis' clothes (seized as evidence when he was a crime victim) was a Fourth Amendment violation, though still subject to the good faith exception to the exclusionary rule. *Id.* at 250-51. But this casts no doubt at all on the court's conclusion that the initial seizure and search of Davis' clothes from the hospital was entirely lawful. And, *Davis* is distinguishable

in any event because it did not address officers' taking possession of crime victims' property pursuant to an established police department policy.

### 2. It is not surprising that Plaintiffs have failed to identify a clearly established right, because the Defendant Officers in fact acted reasonably in complying with established departmental policies.

It is not surprising that cases have not been located finding violations similar to the ones Plaintiffs allege. The Defendant Officers (including those named as "Supervisory Defendants") were doing what reasonable officers should do under the circumstances alleged. Plaintiffs allege that they were acting pursuant to departmental policies. *See, e.g.*, Amended Complaint ¶¶ 103, 107, 111, 116, 140, 142. Defendants were obtaining items from the victim or scene of a serious assault (or homicide), shortly after the time of the crime, that was or could later turn out to be evidence of some probative value, whether incriminating or exculpatory, to maintain them for safekeeping, at least until their probative value could be assessed.[3] Plaintiffs have not identified any legitimate limitation on this function and, indeed, none exists.[4] There is nothing

---

[3] Even applying a plain view analysis, indisputable certainty that an item is evidence of crime is not required. As the Supreme Court has said, again in a case Plaintiffs cite, "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Texas v. Brown*, 460 U.S. 730, 741-42 (1983) (quoting *Payton v. New York*, 445 U.S. 573, 587 (1980)) (emphasis removed). As the *Brown* Court further explained:

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; <u>it does not demand any showing that such a belief be correct or more likely true than false</u>. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.

*Id.* at 742 (some citations omitted) (emphasis added). *Horton v. California*, 496 U.S. 128 (1990), on which Plaintiffs also rely, cast no doubt on *Brown* and in fact cited *Brown*, 496 U.S. at 136.

[4] To the contrary, when police officers fail to make an extensive search and obtain an expansive scope of items from a crime scene or the person of a victim, they are routinely

unreasonable about police officers complying in good faith with established departmental policies.  As explained in the BPD's Reply at 2-3, to the extent Policies 703 and 1401 even address searches or seizures or processing of evidence, they direct that officers act "consistent with the law," and they do not direct officers to act illegally in any event.

In fact, the general circumstances alleged in the Amended Complaint are not unlike inventory searches, which are not dependent on probable cause and are an exception to the warrant requirement.  *Illinois v. Lafayette*, 462 U.S. 640, 643, 648 (1983) (inventory of contents of arrestee's pockets and shoulder bag; holding that it is "not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures").[5]  "[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987).  As the Court later made clear, an inventory search can only be carried out pursuant to an established departmental procedure.  *Florida v. Wells*, 495 U.S. 1, 4-5 (1990).  *See also S. Dakota v. Opperman*, 428 U.S. 364, 372 (1976) ("The decisions of this Court point unmistakably to the conclusion reached by both federal and state courts that inventories pursuant to standard police procedures are reasonable.").  To complete the analogy to this case: Plaintiffs' claims are founded upon the Defendant Officers' compliance with established departmental procedures for processing items found on the persons of gunshot

---

criticized by the defense at trial for conducting an incomplete investigation or performing shoddy police work.  *See also, e.g.*, *California v. Trombetta*, 467 U.S. 479, 486 (1984) ("Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.").

[5]     The *Lafayette* Court explained the rationale for inventory searches and procedures in detail as applied to arrestees.  462 U.S. at 646-47.

victims or at the scenes of the crimes. The Officer Defendants cannot be liable for complying with those procedures in good faith, and there are no factual allegations suggesting otherwise.

### 3. Plaintiffs' remaining arguments are without merit.

Plaintiffs' bald assertion in their Opposition that the items they allege were seized from them at or soon after the time of the assaults were, without exception, "unconnected to the crimes committed" is a legal conclusion that the Court is not required to credit, even on a motion to dismiss standard, and it is not credible under the circumstances in any event. Opp'n at 38. Jumping from that conclusion to the further assertion that the Officer Defendants' conduct is somehow "unequivocally forbidden by Supreme Court precedent," *id.*, is a logical leap that Plaintiffs' web of general propositions plucked from cases with inapposite facts does not support. This is especially true when considering the rationale underlying inventory searches—which, again, are permitted without probable cause.

To the extent evidence is seized that is later deemed not to have probative value, the policies establish a procedure to permit the property's return to the victim or his or her family, as Plaintiffs allege, and Plaintiffs further allege that they generally were provided some form of notice of their property's seizure—just not in a manner that Plaintiffs' counsel believe is sufficient—or received actual notice in some way. As with the search and seizure issues, Plaintiffs still fail to identify a case finding a constitutional violation on similar facts. In *City of West Covina v. Perkins*, 525 U.S. 234, 240-41 (1999), the Court rejected any general rule that notice is required of state law remedies or procedures for return of property seized pursuant to a warrant and noted only that "[i]ndividualized notice that the officers have taken the property is necessary in a case such as the one before us"—where property was seized pursuant to a warrant—"because the property owner would have no other reasonable means of ascertaining who was responsible for his loss." Here, Plaintiffs appear to have been well aware of precisely

what property was seized and that it was seized by members of the BPD.[6]  Plaintiffs have not identified any authority saying that they were entitled to more notice than that.

Moreover, as repeatedly alleged in the Amended Complaint, to the extent Plaintiffs requested the return of property—and one Plaintiff, Mr. Gray, has not made this request, AC ¶¶ 60-62—efforts to return property often were hampered or prolonged by the COVID-19 pandemic.  *See* AC ¶¶ 55, 58-59.  That does not amount to a constitutional violation either.

The Officer Defendants (including those also named as Supervisory Defendants) are entitled to qualified immunity, and the claims against them should be dismissed.

## II. CONCLUSION

For these reasons and for those set forth in the Motion, the Officer Defendants request that this Court grant their Motion to Dismiss.

---

[6]     For example, Plaintiffs had enough notice to be able to allege that "While Ms. Cottman was in a disoriented state and before she was treated for her injuries, Defendant Macklin seized Ms. Cottman's jacket, phone, wig, and shoes without her consent," AC ¶ 50; "While at the hospital, Defendant Converse seized Ms. Spencer's cell phone, jeans, shirt, shoes, and approximately $400 in U.S. currency without her consent or a warrant.  BPD also seized the key to Ms. Spencer's car.  These items remain in BPD custody," AC ¶ 57; "While at the hospital, Defendant DiPasquale seized Mr. Gray's cell phone, a bracelet, a necklace, and several articles of clothing without first obtaining a warrant or Mr. Gray's consent," AC ¶ 61; "BPD officers seized, inventoried, and logged Mr. Cheeks's property into BPD's Evidence Control Unit, including a cell phone, a watch, a driver's license, debit/credit cards, earphones, a lottery ticket, a key holder with two keys, two separate silver keys, a partially empty pack of cigars, a lighter, $435 dollars in U.S. Currency, and numerous articles of clothing," AC ¶ 63.

|  |  |
|---|---|
|  | Respectfully submitted, |
| December 10, 2021 | */s/ Christopher C. Jeffries*<br>Christopher C. Jeffries (Federal Bar No. 28587)<br>Louis P. Malick (Federal Bar No. 11166)<br>Kramon & Graham, P.A.<br>One South Street, Suite 2600<br>Baltimore, Maryland 21202<br>Tel: (410) 752-6030<br>Fax: (410) 539-1269<br>cjeffries@kg-law.com<br>lmalick@kg-law.com<br><br>*Attorneys for Defendants Detective Jeffrey A. Converse, Detective Destinee L. Macklin, Lieutenant Scott Dressler, Sergeant Robert Ross, and Detective Ryan O'Connor* |