**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                                    |     |                              |
|------------------------------------|-----|------------------------------|
| **FAYE COTTMAN,** *et al.*,        | *   |                              |
|                                    | *   |                              |
|                                    | *   |                              |
| **Plaintiffs,**                    | *   |                              |
| **v.**                             | *   | **Civil Case No. 21-cv-00837-SAG** |
|                                    | *   |                              |
| **BALTIMORE POLICE DEPARTMENT,**   | *   |                              |
| *et al.*,                          | *   |                              |
|                                    | *   |                              |
| **Defendants.**                    | *   |                              |
|                                    | *   |                              |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiffs are a group of crime victims who have sued the Baltimore Police Department ("BPD"), the BPD Commissioner, its Deputy Commissioner, two former BPD Commissioners ("Commissioner Defendants"), and several officers ("Officer Defendants"), including a few in supervisory positions ("Supervisory Defendants"), as well as the Mayor of Baltimore City, Brandon Scott. Most of these Defendants are sued in both their official and individual capacities. Plaintiffs, on behalf of themselves and a class of similarly situated individuals, allege numerous constitutional violations related to the BPD's policies and practices of searching, seizing, retaining, and destroying the property of crime victims. Defendants have filed two motions to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6)—one by the BPD and the Commissioner Defendants, ECF 46, and the other by the separately represented Officer Defendants (including those named as Supervisory Defendants), ECF 45. The Court has reviewed these motions, Plaintiffs' opposition, ECF 49, and both replies, ECF 52, 53. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons set forth below, the motions will be granted in part and denied in part.

## I.      FACTUAL BACKGROUND

The following facts are assumed to be true for purposes of adjudicating Defendants' motions.  The Amended Complaint alleges that the BPD engages in a "pattern and practice of unconstitutionally searching, seizing, retaining, and destroying the personal property of victims of violent crimes in Baltimore" in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.  ECF 38 ¶ 1; *id.* at Counts I-XI.

### a.   Individual Allegations

Plaintiff Faye Cottman alleges that a stranger shot her and her 11-year-old son at a playground near the Cherry Hill neighborhood in Baltimore on March 14, 2019.  *Id.* ¶ 47.  While she was in a disoriented state, Defendant Officer Destinee Macklin seized her jacket, phone, wig, and shoes without her consent.  *Id.* ¶ 50.  At some point thereafter, Defendant Macklin and/or other unnamed BPD officers illegally searched Ms. Cottman's phone without her consent or a warrant. *Id.* ¶ 52.  In a subsequent conversation at the hospital, Defendant Macklin told Ms. Cottman that her phone was evidence, even though Ms. Cottman told Defendant Macklin that she had no prior relationship with the shooter and had never seen the shooter before.  *Id.* ¶ 53.  In September, 2019, the Baltimore City Circuit Court found the shooter not criminally responsible, committed her to a psychiatric institution, and closed the case.  *Id.* ¶ 54.  In May, 2020, Defendant Macklin was contacted regarding Ms. Cottman's property.  *Id.* ¶ 55.  After initially agreeing to return it, Defendant Macklin did not respond to further attempts to contact her, and Ms. Cottman's property remains in BPD custody.  *Id.*

On March 20, 2020, Plaintiff Amber Spencer attended a cookout to celebrate her boyfriend's birthday, where she was shot by a stranger.  *Id.* ¶ 56. While at the hospital, Defendant Officer Jeffrey Converse seized Ms. Spencer's cell phone, jeans, shirt, shoes, and approximately

$400 in cash.  *Id.* ¶ 57.  Someone from the BPD also seized the key to her car.  *Id.*  When Ms. Spencer later contacted Defendant Converse, he stated that he was unable to return her property, and that she could retrieve her property once the State of Maryland and the City of Baltimore entered "Phase 3" of the COVID-19 recovery.  *Id.* ¶ 59.  Ms. Spencer's property remains in BPD custody.  *Id.*

On June 29, 2019, a stranger shot Plaintiff Damon Gray while he was walking down the street.  *Id.* ¶ 60.  Mr. Gray was transported by ambulance to the hospital.  *Id.* ¶ 61.  Once there, Defendant Officer AnnMarie DiPasquale seized Mr. Gray's cell phone, a bracelet, a necklace, and several articles of clothing.  *Id.* ¶ 61.  That property remains in BPD custody.[1]  *Id.* ¶ 62.

On June 9, 2018, Dwayne Cheeks—Plaintiff Audrey Carter's son—was shot and killed.  *Id.* ¶ 63.  BPD officers seized, inventoried, and logged Mr. Cheeks's property in the Evidence Control Unit ("ECU"), including a cell phone, a watch, a driver's license, debit and credit cards, earphones, a lottery ticket, a key holder with two keys, two separate silver keys, a partially empty pack of cigars, a lighter, $435 dollars in U.S. Currency, and numerous articles of clothing.  *Id.* ¶ 63.  Ms. Carter repeatedly reached out to Defendant Officers Ryan O'Connor, Robert Ross, and Mark Walrath in an effort to retrieve her son's property.  *Id.* ¶ 64.  On December 12, 2019, Defendant Walrath informed Ms. Carter that Defendant O'Connor would arrange to return to her the $435 in cash.  *Id.* ¶ 65.  However, he also informed her that the BPD had destroyed several of the items seized from her son, including the: driver's license; Visa card; independence card; at least two debit/credit cards; earphones; lottery ticket; key holder with two keys; two separate silver keys; and partially empty pack of cigars.  *Id.*  Defendant Ross wrote to Ms. Carter explaining that,

---

[1] Ms. Cottman, Ms. Spencer, and Mr. Gray allege that they never received any notice documenting the seizure of their property.  *Id.* ¶¶ 51, 58, 62, 79.

although he did not know why the property was destroyed, Defendant Officer Scott Dressler had authorized its destruction. *Id.* ¶¶ 66-67. Ms. Carter emailed several members of the Baltimore City Council to ask for help but received no assistance. *Id.* ¶¶ 68-69. She also contacted the ECU and Defendant Dressler directly who told her that a letter had been mailed to her deceased son and, later, to her at an address of an apartment she had not been living in for five years. *Id.* ¶ 69. However, Ms. Carter had been in near-constant contact with Defendant O'Connor since her son's death, and he knew Ms. Carter's current address. *Id.* Ms. Carter filed two formal complaints with the BPD's Public Integrity Bureau but received identical form responses that her allegations had not been sustained. *Id.* ¶ 70. Ms. Carter emailed then-City Council President Brandon Scott asking for help. *Id.* ¶ 71. He responded asking for more information but took no further steps to investigate or address the issues Ms. Carter had raised, including since he has been sworn in as Mayor. *Id.* ¶¶ 71-72. On June 2, 2021, the United States Attorney's Office for the District of Maryland unsealed an indictment naming Mr. Cheeks's suspected killer. *Id.* ¶ 73. Aside from the cash Mr. Cheeks had on him when he was shot, BPD has not returned any of what remains of his property to Ms. Carter. *Id.*

### b. Class Allegations

Under Federal Rule of Civil Procedure 23, Plaintiffs purport to sue on behalf of themselves, and those similarly situated whose property the BPD "unlawfully seized without a warrant or consent." *Id.* ¶ 33. Plaintiff Spencer purports to represent a "Continuing Seizure Subclass" of plaintiffs "whose property BPD has not returned[.]" *Id.* ¶ 34. She also purports to represent a subclass of plaintiffs whose U.S. Currency BPD has unlawfully seized and not returned, the "Currency Seizure Subclass[.]" *Id.* ¶ 35. Plaintiff Cottman purports to represent an "Illegal Phone Search Subclass" of plaintiffs whose "cell phone contents BPD unlawfully searched." *Id.* ¶ 36.

And Plaintiff Carter purports to represent a "Property Destruction Subclass" of plaintiffs whose property the BPD has unlawfully destroyed. *Id.* ¶ 37.

### c. Legal Claims

All of these allegations relate to BPD Policies 703 and 1401. Plaintiffs claim that these policies authorize the searches and seizures alleged above and permit BPD's handling of Plaintiffs' property. *Id.* ¶ 39. Accordingly, Plaintiffs bring a facial constitutional challenge to both policies. *Id.* at Count I. They also allege violations of the Fourth and Fourteenth Amendments based on the BPD's search of Plaintiff Cottman's phone and the BPD's unreasonable seizures of Plaintiffs' property. *Id.* at Counts II-III. As corollaries to these claims, Plaintiffs argue that the BPD has a "custom, practice, or usage of conducting unreasonable searches and seizures of crime victims' property" in violation of the Fourth and Fourteenth Amendments, and that BPD fails to train and supervise its officers with respect to searching and seizing crime victims' property. *Id.* at Counts IV-VI. Plaintiffs also allege that the BPD has a "custom, practice, or usage of failing to provide Plaintiffs adequate notice and opportunity to be heard" after their property has been seized, in violation of the Fifth and Fourteenth Amendments. *Id.* at Count VII. Similarly, the Amended Complaint alleges that the BPD fails to supervise and train its officers on those due process requirements. *Id.* at Counts VIII-IX. Finally, the Amended Complaint alleges that Mayor Scott, in his official capacity, has condoned these unlawful practices. *Id.* at Counts X-XI.

## II.    LEGAL STANDARD

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of*

*Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by

a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of

law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading

requirements of Federal Rule of Civil Procedure 8(a)(2).  That rule provides that a complaint must

contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The

purpose of the rule is to provide defendants with "fair notice" of the claims and the "grounds" for

entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), a complaint must

contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S.

at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the

pleading standard for all civil actions[.]") (quotation omitted); *see also Willner v. Dimon*, 849 F.3d

93, 112 (4th Cir. 2017).  However, a plaintiff need not include "detailed factual allegations" in

order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Further, federal pleading rules "do not

countenance dismissal of a complaint for imperfect statement of the legal theory supporting the

claim asserted."  *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation.  *Twombly*,

550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a

complaint provides no more than "labels and conclusions" or "a formulaic recitation of the

elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  Rather, to satisfy the

minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken

as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is

improbable and . . . recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556.

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). However, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

## III.   ANALYSIS

### a.   Facial Constitutionality of Policies 703 and 1401

A facial challenge to a law is an attack on the law itself, rather than any particular application of it. *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015). As the Supreme Court has stated, a facial challenge requires the plaintiff to meet a "most exacting standard" that requires the plaintiff to "establish that a law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008). Put differently, the plaintiff "must establish that no set of circumstances exists under which the [law] would be valid[.]" *United States v. Salerno*, 481 U.S. 739, 745 (2011).

However, when evaluating a facial challenge under this standard, courts must consider "only applications of the [law] in which it actually authorizes or prohibits conduct." *Patel*, 576

U.S. at 418.  For example, the government may not defeat a facial challenge to a law that allegedly authorizes warrantless searches by pointing to situations in which a warrant exception independently justified a particular search.  That is because the exception—*not the challenged law*—justified the search.  As the Supreme Court has explained, "[i]f exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute.  Statutes authorizing warrantless searches also do no work where the subject of a search has consented."  *Id.* at 418-19.  Thus, "when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant."  *Id.* at 418.

Here, Plaintiffs argue that BPD Policies 703 and 1401 are facially unconstitutional.  Policy 703 describes BPD procedures for death and serious assault investigations, and Policy 1401 describes procedures "to ensure the effective and efficient handling of all evidence and property in accordance with the Federal Rules of Evidence."  ECF 46-3.

Plaintiffs argue that both policies are facially unconstitutional because they "authorize the warrantless and nonconsensual seizures and searches of crime victims' non-evidentiary property; in other words, these policies authorize unconstitutional searches and seizures."  ECF 49 at 13.  Defendants argue, however, that nothing in either policy "instructs or authorizes an officer to seize property in an unconstitutional manner."  ECF 46-1 at 15.

This Court agrees with Defendants.  Neither policy says anything about whether officers should or should not obtain a warrant or otherwise abide by the Fourth Amendment's restrictions on searches and seizures.  And the policies' silence on that topic is certainly not, as Plaintiffs suggest, a "command" that officers violate the Fourth Amendment.  ECF 49 at 16.  For example, Plaintiffs make much of the fact that Policy 703 instructs officers to "[t]ake possession of the

clothing of the victim and all available evidence" when they are assigned to accompany certain victims to the hospital. *See id.* at 17. But that instruction does not require officers to violate the Fourth Amendment. If, for example, an officer accompanying a victim to the hospital obtains a valid warrant before taking possession of the victim's clothing, the officer's conduct would be perfectly consistent with Policy 703's instructions, and, at the same time, clearly within the bounds of the Fourth Amendment. While Policy 1401 does not address seizures at all, none of its provisions authorizes, much less commands, constitutional violations. Even if, as Plaintiffs argue, the policies could be read to direct officers to search and seize *non-evidentiary* property (for which the officers, presumably, would never be able to obtain a valid warrant), they do not require officers to search or seize such property *in every relevant instance*. In other words, there are very likely cases in which all of a victim's property has potential evidentiary value and, therefore, even strict compliance with the policies (as Plaintiffs read them) would not require the warrantless search or seizure of non-evidentiary property. The challenged policies, therefore, are clearly not "unconstitutional in all of [their relevant] applications." *Washington State Grange*, 552 U.S. at 449; *Patel*, 576 U.S at 418. Accordingly, Plaintiffs' facial challenge must fail.[2]

---

[2] The parties argue at length about whether the policies are facially unconstitutional because they allegedly authorize prolonged seizures of property. Relatedly, they dispute whether a prolonged seizure can amount to a Fourth Amendment violation at all. The parties' debate misses the point: the policies clearly do not *require*, in *all relevant applications*, that the BPD retain property for an unconstitutionally long period of time. In fact, Policy 1401 specifically spells out procedures and timelines for when property must be returned to victims. *See* ECF 46-4 at 5-6. Plaintiffs do not earnestly contend that those procedures and timelines are somehow unconstitutional, they just argue that the BPD does not follow them. *See* ECF 49 at 15. Plaintiffs might be right, but their argument does not support a *facial* challenge to the policies—BPD's alleged failure to follow the policies does not render the policies themselves unconstitutional.

**b.** *Monell* **Claims**

If any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives a United States citizen of any constitutional right, he may be liable in a suit for money damages.  42 U.S.C. § 1983.  In *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), the Supreme Court held that municipalities may be liable for a plaintiff's constitutional harms pursuant to § 1983.  There are three necessary elements for *Monell* liability.  First, the plaintiff must plausibly allege a constitutional harm that stems from the acts of a municipal employee "taken in furtherance of some municipal 'policy or custom.'"  *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (quoting *Monell*, 436 U.S. at 694); *see also Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).  As interpreted by the Fourth Circuit, a "policy or custom" can exist in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).  Second, the plaintiff must allege facts showing that the policy's creation is fairly attributable to the municipality.  *Spell*, 824 F.2d at 1389; *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014) ("Only if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the sine qua non of *Monell* liability.").  Third, the plaintiff must allege an affirmative causal link between the "policy or custom" and the particular injury suffered by the plaintiff.  *Spell*, 824 F.2d at 1389.

Plaintiffs here allege *Monell* claims based on several theories of liability: (1) condonation; (2) failure to train; and (3) failure to supervise.  Plaintiffs purport to bring these claims against the

BPD, the BPD Commissioners, the Supervisory Defendants, and the Mayor.  The parties dispute, however, whether a *Monell* claim may be brought against individual defendants in their official capacities.

Plaintiffs misunderstand what it means to bring a *Monell* claim.  As described above, *Monell* provides that a municipality may be sued for its own illegal acts under § 1983.  While § 1983 allows a plaintiff to sue a "person" for constitutional violations committed while acting under color of state law, it was unclear, prior to *Monell*, whether a municipality qualified as a "person" for purposes of § 1983 liability.  *Monell* resolved that question by holding that municipalities may be sued under § 1983.  *Monell*, 436 U.S. at 663 (overruling the Supreme Court's prior decision in *Monroe v. Pape*, 365 U.S. 167 (1961), "insofar as it holds that local governments are wholly immune from suit under § 1983.").

Where, however, a plaintiff sues *both* individual officers in their official capacities under § 1983, and a municipality under *Monell*, for following a particular "policy or custom" that resulted in alleged constitutional harm, the claims are duplicative.  *See Grim v. Baltimore Police Dep't*, No. ELH-18-3864, 2019 WL 5865561, at *16 (D. Md. Nov. 8, 2019) (dismissing a claim against the BPD Commissioner "as it is duplicative of [the plaintiff's] *Monell* claim against the BPD.") (citing *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) ("The district court correctly held that the § 1983 claim against [the defendant] in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative.")).  That is because "[o]fficial-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (quoting *Monell*, 436 U.S. at 690 n.55); *see Huggins v. Prince George's County*, 683 F.3d 525, 532 (4th Cir. 2012).  As the Supreme Court stated in *Graham*, "[a]s long as the government entity receives

11

notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Graham*, 473 U.S. at 166.

Here, Counts II-IX purport to bring both *Monell* claims against the BPD (Counts IV-IX) and official capacity claims against individual officials (Counts II-IX) based on what seems to be the same conduct. These claims are, therefore, duplicative. *Lyles v. Prawdzik*, No. PWG-15-1056, 2016 WL 3418847, at *2 (D. Md. June 22, 2016) ("[T]he suit against the officers in their official capacity is duplicative because Lyles also has brought a *Monell* claim against Riverdale Park."); *Ulloa v. Prince George's County, Md.*, No. DKC-15-257, 2015 WL 7878956, at *6 (D. Md. Dec. 4, 2015) ("[B]ecause Plaintiffs have failed to state a plausible *Monell* claim alleging that a policy or custom of the County caused the deprivation of Plaintiffs' rights, Plaintiffs have similarly failed to state a claim under § 1983 against [the police officers] in their official capacities."); *White v. City of Hagerstown*, No. JKB-18-3232, 2020 WL 3034852, at *6 (D. Md. June 5, 2020) ("White's official capacity claims against Officer McKoy will be dismissed as duplicative of his *Monell* claim against the City.").

Accordingly, Counts II-IX will be dismissed insofar as they bring official capacity claims under § 1983 against individual BPD officials.

### i. Condonation

Under a *Monell* condonation theory of liability, a municipality is liable if its policymakers fail "to put a stop to or correct a widespread pattern of unconstitutional conduct." *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389). To state a claim for liability under such a theory, a plaintiff must point to a "'persistent and widespread practice of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.' Both knowledge and

indifference can be inferred from the 'extent' of employees' misconduct.  Sporadic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will."  *Id.* at 402-03 (quoting *Spell*, 824 F.2d at 1386-91) (internal citations omitted).

### 1.  Search and Seizure (Count IV)

Defendants argue that the Amended Complaint does not contain allegations of any "widespread or flagrant" search and seizure violations.  ECF 52 at 10-11.  They continue that while Plaintiffs allege that *their own* rights were violated, "[t]here are no allegations that anyone else's property was illegally searched or seized (aside from the nebulous, unadorned allegation that there are so many people that a class action is appropriate), nor are there any facts alleged to support the bald assertion that illegal searches or seizures were a widespread practice."  *Id.* at 11.  Moreover, Defendants argue that "[t]here is only one allegation of anyone's phone being illegally searched (Cottman)."  *Id.*

Contrary to Defendants' assertions, the Amended Complaint alleges a widespread practice of warrantless searches and seizures of victims' property that stretches beyond Plaintiffs' own cases.  For example, the Amended Complaint alleges that: "on information and belief, the victims of these serious assaults were subject to searches pursuant to [BPD Policies 703 and 1401].  Indeed, Plaintiffs have received information indicating that this practice is widespread and at least one staff member of a Baltimore-area hospital has indicated that these practices are routine."  ECF 38 ¶ 39.  The Amended Complaint continues by alleging that, "[i]n practice, BPD officers who accompany a victim to the hospital search and seize the victim's clothing and all available *property*[,]" *id.* ¶ 82 (emphasis in original), and that "BPD's widespread custom and practice is to seize all available property from victims of serious assaults and categorize it as 'evidence' regardless of the reasonableness of the seizure and/or search."  *Id.* ¶ 84.  Finally, the Amended Complaint alleges

that these practices were "expressly and implicitly condoned and sanctioned by BPD, the BPD Commissioners, and the Baltimore City Mayor.  It has occurred enough times that BPD, BPD Commissioners, and the Baltimore City Mayor knew or should have known of this widespread custom, policy, practice or usage." *Id.* ¶ 87.

These allegations, coupled with the allegations of Plaintiffs' own cases, suffice to state a plausible condonation claim against the BPD.  Taken as true, the allegations in the Amended Complaint do not merely describe "isolated" or "sporadic" violations, but rather a practice or custom of at least arguably unconstitutional searches and seizures that are condoned by BPD leadership.  As in *Owens*, the allegations of unconstitutional searches and seizures "on multiple occasions could establish a 'persistent and widespread' pattern of practice, the hallmark of an impermissible custom."  *Owens*, 767 F.3d at 403.  Similarly, "[i]f (but only if) the duration and frequency of this conduct was widespread and recurrent, the [BPD's] failure to address it could qualify as 'deliberate indifference.'"  *Id.*  Accordingly, the BPD's motion to dismiss must be denied as to Count IV.

## 2.  Procedural Due Process Allegations (Count VII)

Likewise, the Amended Complaint states a claim against the BPD on the theory that it condoned a practice or custom of depriving procedural due process to crime victims whose property it searches, seizes, and then retains.  These allegations include the failure to provide notice of seizures, ECF 38 ¶¶ 51, 58, 62, 187, 195-97, 207-09, as well as the failure to adhere to departmental policies established to provide for the return of seized property.  *See id.* ¶¶ 55, 59, 65-69, 79, 80, 98, 187.  With respect to notice, the Supreme Court has held, "when law enforcement agents seize property pursuant to [a] warrant, due process requires them to take reasonable steps to give notice that the property has been taken so the owner can pursue available remedies for its

return." *City of West Covina v. Perkins*, 525 U.S. 234, 240 (1999).  While Plaintiffs here allege that their property was seized without a warrant, the due process clause requires notice whether or not property was seized pursuant to a warrant.  *See id.* ("Individualized notice that the officers have taken the property is necessary in a case such as the one before us because the property owner would have no other reasonable means of ascertaining who was responsible for his loss."); *see also Brown v. District of Columbia*, 115 F. Supp. 3d 56, 68-69 (D.D.C. 2015) (denying the District's motion to dismiss procedural due process claims alleging that the District failed to provide notice of property seized under forfeiture laws where some property was seized pursuant to a warrant and some was seized without a warrant).

In Plaintiffs' individual cases, the Amended Complaint alleges that, "BPD . . . has failed to afford Plaintiffs notice of the seizure of the Subject Property and an opportunity to be heard on the question of whether the property should be retained, returned, or destroyed."  ECF 38 ¶ 79; *see id.* ¶¶ 51, 58, 62, 187, 195-97, 207-09.  More broadly, the Amended Complaint alleges that "BPD does not adequately notify property claimants of their rights as required by law.  In spite of possessing the correct contact information for property claimants, BPD sends official correspondence to outdated addresses, and some or all of the required notice period preceding the disposal of property is consumed by BPD's own inability to mail correspondence in a timely manner."  *Id.* ¶ 93.  Finally, the Amended Complaint alleges that, "[t]he practice of denying the Continuing Seizure Subclass Members, the Currency Seizure Subclass Members, and the Property Destruction Subclass Members adequate notice and opportunity to seek the return of seized property was, at the time Plaintiffs were deprived of their rights, a longstanding, widespread, or well-settled custom that constituted a standard operating procedure of BPD."  *Id.* ¶ 187.

Defendants argue that Plaintiffs' procedural due process claims should be dismissed because they have not exhausted remedies made available to them by state law to pursue the return of their property (including, for example, suing the BPD in state court for various tort claims). ECF 46-1 at 19-22. In making this argument, the BPD Defendants rely on *Perkins*, and a Fourth Circuit case, *Mora v. City of Gaithersburg*, 519 F.3d 216 (4th Cir. 2008).

As discussed above, *Perkins* does more to undermine the BPD Defendants' argument than help it. And in *Mora*, the plaintiff was seeking the return of property that was lawfully seized from his house. *Mora*, 519 F.3d at 229-30. Instead of pursuing state law tort claims, the plaintiff brought a § 1983 action based on the failure to return his property. That is not what is happening here. Rather, Plaintiffs assert they were never provided notice that their property was seized from them and that they were not given an "opportunity to be heard on the question of whether the property should be retained, returned, or destroyed." ECF 38 ¶ 79. While *Mora* instructs that state law tort claims may be one avenue Plaintiffs could pursue to seek the return of their property, that is not a viable avenue for the type of constitutional due process claims Plaintiffs assert here.

At this point, the Amended Complaint's allegations that Plaintiffs received neither notice nor an opportunity to be heard with respect to the property that was seized from them—and that the BPD maintained a practice or custom of such violations—raise a plausible claim that they were denied due process as required by the Fourteenth Amendment.[3]

---

[3] The allegations do not, however, state a claim under the Fifth Amendment and, therefore, will be dismissed insofar as they allege a violation of the Fifth Amendment's due process protections. *Massey v. Ojaniit*, 759 F.3d 343, 354 n.5 (4th Cir. 2014) ("Thus, although Count I refers to both the Fifth and Fourteenth Amendments, Massey's relevant due process protections are found in the Fourteenth, rather than the Fifth, Amendment."); *United States v. Hornsby*, 666 F.3d 296, 310 (4th Cir. 2012) ("[T]he Fourteenth Amendment's Due Process Clause is a limitation on state conduct," while the "due process protections against the federal government are found in the Fifth Amendment.").

### ii.  Failure to Train (Counts V and VIII)

Plaintiffs argue that the BPD fails to adequately train its officers on their obligations to conduct lawful searches and seizures (Count V) and to provide procedural due process to those from whom it seizes property (Count VIII).  A plaintiff can establish the requisite "policy" for *Monell* liability through a failure to train, if it "reflects a 'deliberate' or 'conscious' choice" to not do so.  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  Training policy deficiencies can include (1) "express authorizations of unconstitutional conduct," (2) "tacit authorizations" of such unconstitutional conduct, and (3) failures to adequately "prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty."  *Spell*, 824 F.2d at 1390.  No matter which theory is alleged, the plaintiff must point out "a specific deficiency" in training, "rather than general laxness or ineffectiveness in training."  *Id.*; *see also, e.g.*, *McDowell v. Grimes*, No. GLR-17-3200, 2018 WL 3756727, at *4 (D. Md. Aug. 7, 2018).  Second, a plaintiff must establish that the municipality's failure to train showed a "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (alteration in original).  Deliberate indifference is shown if "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights."  *Harris*, 489 U.S. at 390; *accord Jordan by Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994).  Finally, the plaintiff must show that "the officer's conduct resulted from said training," or lack thereof.  *McDowell*, 2018 WL 3756727, at *4 (quoting *Jones v. Chapman*, No. ELH-14-2627, 2015 WL 4509871, at *18 (D. Md. July 24, 2015)).

It is, however, important to note that oftentimes "a plaintiff lacks specific details regarding the municipal actor's internal polices and training procedures before discovery.  Although boilerplate allegations will not suffice, at the motion to dismiss stage, courts should not expect the

plaintiff to possess a rich set of facts concerning the allegedly unconstitutional policy and the responsible policymakers." *Johnson v. Baltimore Police Dep't*, No. ELH-19-00698, 2020 WL 1169739, at *34 (D. Md. Mar. 10, 2020) (citing *Ulloa*, 2015 WL 7978956, at *6 (requiring that the plaintiff "pair *general* averments of a policy or custom with particular examples" to state a *Monell* claim) (emphasis added)).

The BPD argues that Plaintiffs' allegations are insufficiently detailed to state a *Monell* claim based on the BPD's failure to train its officers. ECF 46-1 at 26-27. This Court disagrees. The Amended Complaint does not merely recite boilerplate allegations that the BPD should have more adequately trained its officers. Rather, it identifies specific deficiencies in BPD's training: namely, its failure to train officers to conduct lawful searches and seizures and to provide the individuals from whom it seizes property with procedural due process. ECF 38 ¶¶ 88-93. Then, it couples those allegations of deficiencies with numerous concrete examples of alleged misconduct. *See Ulloa*, 2015 WL 7978956, at *6; *Estate of Bryant v. Baltimore Police Dep't*, No. ELH-19-384, 2020 WL 673571, at *39 (D. Md. Feb. 10, 2020) (denying the BPD's motion to dismiss a failure to train claim where "[p]laintiffs identif[ied] a specific deficiency with BPD's training . . . [and] highlight[ed] eight instances" of alleged violations that "illustrate[d] th[e] training defect").

After describing Plaintiffs' own cases, which, as explained above, serve as examples of the Fourth Amendment and due process violations that the BPD's training programs allegedly fail to address, the Amended Complaint alleges specific deficiencies in the BPD's training programs. The Amended Complaint alleges that the BPD has failed to "adequately train its officers to conduct lawful searches and seizures." ECF 38 ¶ 88. It goes on to allege that the BPD's knowledge of ongoing Fourth Amendment and due process violations shows that it does not adequately train its

officers to "notify property claimants of their rights as required by law." *Id.* ¶ 93.  Finally, the Amended Complaint cites specific BPD training materials that it claims inadequately address the Fourth Amendment and due process allegations they raise.  *Id.* ¶ 99.

These allegations "go well beyond a generic restatement of the elements of a *Monell* claim and are sufficient to provide the BPD with fair notice" of Plaintiffs' claims.  *Estate of Bryant*, 2020 WL 673571, at *39; *Jones v. Jordan*, No. GLR-16-2662, 2017 WL 4122795, at *6-7 (D. Md. Sept. 18, 2017) (finding that allegations that the BPD's training on the use of force, de-escalation, searches and seizures, and supervising misconduct sufficiently stated a *Monell* claim).

### iii.  Failure to Supervise (Counts VI and IX)

Similar allegations support the conclusion that Plaintiffs have stated a plausible *Monell* claim based on the BPD's failure to supervise its officers.  To state a claim for failure to supervise, the plaintiff must allege:

> (1) that the supervisor had 'actual or constructive knowledge' that a subordinate was engaged in conduct that 'posed a pervasive and unreasonable risk of constitutional injury'; (2) that the supervisor's response to that knowledge 'was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices'; and (3) an 'affirmative causal link' between the supervisor's inaction and the plaintiff's alleged constitutional injury.

*Brown v. Bratton*, No. ELH-19-1450, 2020 WL 886142, at *34 (D. Md. Feb. 21, 2020) (quoting *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014)); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).  However, under *Monell*, "[a] failure to supervise gives rise to municipal liability 'only in those situations in which there is a history of widespread abuse.'"  *Washington v. Baltimore Police Dep't*, 457 F. Supp. 3d 520, 537 (D. Md. 2020) (quoting *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983)).

The Amended Complaint alleges that BPD supervisors had both actual and constructive knowledge of widespread Fourth Amendment and due process violations.  Plaintiffs allege that

supervisors had constructive knowledge because the alleged constitutional violations were prevalent and widespread.  *See, e.g.*, ECF 38 ¶ 39 ("on information and belief, the victims of these serious assaults [over 2,100 incidents classified as shootings since April, 2018] were subject to searches pursuant to [BPD] policies.  Indeed, Plaintiffs have received information indicating that this practice is widespread and at least one staff member of a Baltimore-area hospital has indicated that these practices are routine.").  Plaintiffs also allege that BPD had actual knowledge of one violation, at least as of late 2019, after Plaintiff Carter formally complained to the BPD.  *See id.* ¶ 70.

Plaintiffs' failure to supervise claim presents a closer question than their condonation and failure to train claims, but these allegations suffice to survive Defendants' motions.  "[A] municipal policy or custom giving rise to § 1983 liability will not be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230.  Although the Amended Complaint only alleges the BPD's actual knowledge of a single constitutional deprivation, as explained above, it also alleges pervasive misconduct sufficient to raise an inference that the BPD had constructive knowledge of such misconduct.  If those allegations are true (and this Court must assume they are), they raise an inference that the BPD was deliberately indifferent to its supervisory obligations because, "the need for more or different training is . . . obvious, and the inadequacy in training is . . . likely to result in the violation of constitutional rights."  *Harris*, 489 U.S. at 390; *Jordan by Jordan*, 15 F.3d at 341.  Accordingly, the BPD's motion to dismiss must be denied as to the Amended Complaint's failure to supervise claims against the BPD.

**c. Official Capacity Claims Against Mayor Scott (Counts X and XI)**

Plaintiffs assert two claims against Mayor Scott, in his official capacity as Mayor of Baltimore City, for allegedly "condoning" the unconstitutional conduct alleged in the Amended Complaint. These claims are both legally improper and factually inadequate. They will be dismissed.

As an initial matter, the Amended Complaint again betrays a confusion about the difference between a *Monell* claim against a municipality and a § 1983 claim against an officer in his or her official capacity. For example, although the claims against Mayor Scott use the language of a *Monell* claim (*i.e.* "condonation" and "custom, practice, or usage"), and Plaintiffs' briefing describes those claims as "[p]ursuant to the *Monell* condonation theory of liability[,]" ECF 49 at 25, Plaintiffs have, in fact, sued Mayor Scott (the official) rather than the Mayor and City Council of Baltimore (the municipal entity). These claims are, therefore, § 1983 claims against Mayor Scott in his official capacity as Mayor of Baltimore City.

Regardless, as this Court recently held, "[t]he case law analyzing the issue of whether the Mayor of Baltimore City is liable under Section 1983 for the conduct [of] BPD officers is legion, and almost exclusively one-sided: '[Baltimore] City simply does not exert legal control over the BPD within the ambit of Section 1983.'" *Washington*, 457 F. Supp. 3d at 538 (quoting *Burgess v. Baltimore Policy Dep't*, No. RDB-15-0834, 2016 WL 795975, at *5 (D. Md. Mar. 1, 2016)). In *Estate of Anderson v. Strohman*, United States District Judge George L. Russell III explained that the rationales underlying previous decisions from this District, holding that the Mayor and City Council could be held liable under § 1983 for the conduct of BPD officers, were unpersuasive, given the "mountain of law," both at the federal and state level, "insisting [that] the City does not sufficiently control the BPD or Baltimore police officers." 6 F. Supp. 3d 639, 646 (D. Md. 2014);

*see id.* at 643-46. Judge Russell concluded that "Baltimore police officers are state employees free from the City's supervision and control," and, therefore, the City "cannot be liable" for BPD officers' conduct under § 1983. *Id.* Since this decision, courts in this District have followed suit, and held the same. *See, e.g.*, *Harrod v. Mayor & City Council Balt. City*, No. GLR-18-2542, 2019 WL 5636392, at \*2-3 (D. Md. July 24, 2019); *Whetstone v. Mayor & City Council of Balt.*, No. ELH-18-738, 2019 WL 1200555, at \*12-13 (D. Md. Mar. 13, 2019); *Burgess*, 2016 WL 795975, at \*5-6; *Dale v. Mayor & City Council of Balt. City*, No. WDQ-14-2152, 2015 WL 5521815, at \*3-4 (D. Md. Sept. 15, 2015); *Holloman v. Rawlings-Blake*, No. CCB-14-1516, 2014 WL 7146974, at \*4 (D. Md. Dec. 12, 2014).

The ruling in *Estate of Anderson*, and in the subsequent cases cited above, comports with the Maryland Court of Appeals's view of the BPD's classification as a State, not local, agency:

> The decisions of this Court concerning the liability of the City of Baltimore for the acts, activity[,] and inaction of the Police Department, *over which it has no power*, have been consistent and unequivocal, premised on, and holding uniformly, that the Baltimore Police Department is an entity of the State, and not of the City of Baltimore.

*Mayor & City Council of Balt. v. Clark*, 404 Md. 13, 26 (2008) (citations omitted) (emphasis added). In fact, in 1988, the Court of Appeals rejected the argument that the Baltimore City Mayor's newfound power to appoint the BPD Commissioner impacted this longstanding principle:

> It is true that, by Ch. 920 of the Acts of 1976, the General Assembly transferred the power to appoint the Baltimore City Police Commissioner from the Governor to the Mayor of Baltimore City. At the same time, however, the General Assembly maintained the express designation of the Baltimore City Police Department as a *state* rather than a local government agency. Furthermore, the General Assembly, and not the Baltimore City Council, has continued to be the legislative body enacting significant legislation governing the Baltimore City Police Department.

*Clea v. Mayor & City Council of Balt.*, 312 Md. 662, 669 (1988) (internal citations omitted); *see also Clark*, 404 Md. at 28 ("[N]otwithstanding the Mayor's role in appointing and removing the City's Police Commissioner, the Baltimore City Police Department is a state agency.").

In fact, "[t]he City of Baltimore, as a matter of law, is not permitted to regulate or supervise the Baltimore Police Department." *Young v. City of Baltimore*, No. GLR-16-1321, 2017 WL 713860, at *2 (D. Md. Feb. 23, 2017). This is because Article II, section 27 of the Baltimore City Charter explicitly provides that "no ordinance of the City or act of any municipal officer shall conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner." *See also Clark*, 404 Md. at 23 (reciting this provision). And if the Police Commissioner refuses to implement the policy objectives of a Baltimore City Mayor, the Mayor cannot fire the Commissioner for that reason alone. As the Court of Appeals explained in *Clark*, the Mayor may only remove the Commissioner for cause: "for official misconduct, malfeasance, inefficiency or incompetency, including prolonged illness, in the manner provided by law in the case of civil officers." *Id.* at 28. The only body with the authority to enact significant change with regard to the BPD's structure and functions, outside of the Commissioner, is the Maryland General Assembly. *Id.* at 25-26; *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 312-13 (2001); *Clea*, 312 Md. at 669.

Nonetheless, Plaintiffs argue that they "do not sue Defendant Scott for the tortious conduct of BPD or its Officers. Plaintiffs sue Defendant Scott because he knew of the ongoing constitutional violations and failed to stop them." ECF 49 at 25. Even assuming the factual allegations created an inference of that statement's truth, which they do not, the voluminous body of case law explained above shows that Mayor Scott was not in a position to stop any of the unconstitutional conduct alleged in the Amended Complaint because, "[t]he City of Baltimore, as

23

a matter of law, is not permitted to regulate or supervise the Baltimore Police Department." *Young*, 2017 WL 713860, at *2.

Regardless, the factual allegations do not come close to raising an inference that Mayor Scott knew about the constitutional violations alleged in the Amended Complaint. Plaintiffs allege that Ms. Carter emailed Mayor Scott (who was, at the time, City Council President) and "explained that BPD had destroyed her son's property" and asked him to intervene with BPD leadership. ECF 38 ¶ 71. According to the Amended Complaint, Mayor Scott replied, "requesting more information[,]" and the Amended Complaint is conspicuously silent as to whether he ever received that information. *Id.* Notwithstanding the mountain of caselaw that forecloses the claims against Mayor Scott, to infer that he was aware of *widespread* constitutional violations of the type alleged in the Amended Complaint based on a single email about a single alleged violation (sent to him while he was City Council President) would be a monumental leap. Accordingly, Counts X and XI will be dismissed.

### d. Individual Capacity Claims

Plaintiffs also allege that the BPD Commissioners, Officer Defendants, and Supervisory Defendants are liable—in their personal capacities—for the unconstitutional conduct alleged in the Amended Complaint. "To establish personal liability under § 1983 . . . the plaintiff must 'affirmatively show[] that the official charged acted personally in the deprivation of the plaintiff's rights.' That is, the official's 'own individual actions' must have 'violated the Constitution.' Importantly, mere knowledge of such a deprivation does not suffice." *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (first quoting *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) then quoting *Iqbal*, 556 U.S. at 676) (alteration in original). "Moreover, an

individual cannot be held liable under § 1983 under a theory of respondeat superior." *Proctor v. Wells Fargo Bank, N.A.*, 289 F. Supp. 3d 676, 690 (D. Md. 2018).

### i. BPD Commissioners

The Amended Complaint does not allege that Commissioner Harrison or former Commissioners Tuggle or DeSousa played any personal role in the deprivation of Plaintiffs' constitutional rights. Aside from alleging that Policies 703 and 1401 were implemented upon the order of the Police Commissioner, ECF 38 ¶ 81, and that the Commissioner Defendants knew or should have known of the unconstitutional conduct alleged in the Amended Complaint, there are no allegations that the Commissioner Defendants were, in any way, personally involved in the conduct alleged in the Amended Complaint. As stated above, the Commissioner Defendants cannot be held personally liable merely because they knew or should have known about the alleged unconstitutional conduct. *Williamson*, 712 F.3d at 171. Moreover, even if the Commissioner Defendants played a role in enacting Policies 703 and 1401, because those policies are not themselves unconstitutional, any such role does not constitute personal involvement in the constitutional violations alleged in the Amended Complaint. The Amended Complaint, therefore, will be dismissed as to Defendants Harrison, Tuggle, and DeSousa.

### ii. Supervisory Liability

The parties also dispute whether the Amended Complaint states a claim for supervisory liability. It is unclear to this Court whether the Amended Complaint attempts to allege such a claim against the Supervisory Defendants (confusingly also named as Officer Defendants), and/or

the BPD Commissioners, in their individual capacities.[4]  To the extent it does, though (presumably as part of Counts VI and IX), those claims will be dismissed.

Courts in this district have used the same standard—originally set forth by the Fourth Circuit in *Shaw*, 13 F.3d at 799—to analyze both *Monell* failure to supervise claims and personal capacity supervisory liability claims.  *Compare Brown*, 2020 WL 886142, at *34 (analyzing *Monell* failure to supervise claim under the Fourth Circuit's *Shaw* standard for supervisory liability) *with Proctor*, 289 F. Supp. 3d at 690-91 (analyzing personal capacity supervisory liability claim under the *Shaw* standard).[5]  The difference, however, is that a *Monell* claim turns on whether the municipal defendant has adopted a widespread practice or custom of failing to supervise its officers, whereas a personal capacity supervisory liability claim turns on whether an individual supervising defendant knew about, was deliberately indifferent to, and—through his or her inaction—caused the constitutional injury alleged.  *See King v. Rubenstein*, 825 F.3d 206, 223-24 (4th Cir. 2016) (explaining the difference between supervisory liability standard for official capacity claims (including *Monell* claims) and personal capacity supervisory liability claims); *Pratt-Miller v. Arthur*, 701 F. App'x 191, 192-94 (4th Cir. 2017) (same); *see also Washintgon*, 457 F. Supp. 3d at 537 ("A failure to supervise gives rise to municipal liability 'only in those situations in which there is a history of widespread abuse.'") (quoting *Wellington*, 717 F.2d at 936).

---

[4] To the extent it attempts to bring supervisory liability claims against these Defendants in their official capacities, those claims are dismissed as duplicative of their *Monell* failure to supervise claims.

[5] That standard is explained, above, in this Court's analysis of Plaintiffs' failure to supervise claims.

The Amended Complaint, however, does not allege that any Defendant who exercises supervisory authority had actual or constructive knowledge that any subordinate was engaged in any misconduct, or that they were deliberately indifferent to that misconduct.  With respect to the Commissioner Defendants, the Amended Complaint does not allege any specific facts that the Commissioner Defendants knew about any misconduct by subordinates and failed to act on it.  And the allegations against the so-called Supervisory Defendants do not concern those Defendants' supervision of any subordinates.  Thus, while the Amended Complaint's allegations of widespread misconduct and the failure of *any* BPD supervisors to remedy that misconduct are sufficient to state a *Monell* failure to supervise claim *against the BPD*, they are insufficient to state a claim that any of the *individual supervisors* named in the Amended Complaint could be held personally accountable under a theory of supervisory liability.

### iii.  Officer Defendants

The Officer Defendants argue they are entitled to qualified immunity to shield them from the claims against them in their individual capacities.  "Qualified immunity 'shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).  The doctrine balances the need to hold irresponsible public officials accountable with the need to protect government officials who "perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity is properly invoked where an officer's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam).  Thus, to defeat a claim of qualified immunity, the plaintiff must "demonstrate that (1) the defendant violated the plaintiff's

constitutional rights, and (2) the right in question was clearly established at the time of the violation." *Adams*, 884 F.3d at 226.  Courts have discretion over which prong they address first. *Pearson*, 555 U.S. at 236.  However, "[c]learly established" should not be "defined 'at a high level of generality.'" *Id.* at 551-52 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  Although a previous case need not be "'directly on point' for a right to be clearly established 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* at 551 (quoting *Mullenix*, 557 U.S. at 12).

### 1.  Alleged Constitutional Violations

With respect to the first prong, the Amended Complaint states a claim that Officer Defendants Macklin, Converse, and DiPasquale each engaged in conduct that violated Plaintiffs' Fourth Amendment rights.  The Amended Complaint states a claim that each of those Defendants participated in unlawfully seizing non-evidentiary property—in other words, property for which there was allegedly no probable cause to believe that it was evidence of a crime.[6]  ECF 38 ¶¶ 47-62, 128-29.  Defendant Macklin allegedly seized Ms. Cottman's jacket, phone, wig, and shoes, all without a warrant.[7]  *Id.* ¶¶ 50-53.  Similarly, Defendant Converse allegedly seized Ms. Spencer's

---

[6] This finding was a close call given the Amended Complaint's inartful allegations.  With respect to the named Plaintiffs' individual cases, the Amended Complaint repeatedly alleges that their property was taken without "consent or a warrant."  *See, e.g.*, ECF 38 ¶ 57.  Of course, lawful seizures can occur without either consent or a warrant—often, for example, where an officer seizes something pursuant to a valid warrant exception like the plain view or exigent circumstances doctrines.  As this case progresses, these exceptions may turn out to present significant barriers for Plaintiffs, particularly with respect to their claims against the Officer Defendants in their individual capacities.  At this stage, however, this Court is required to view the Amended Complaint as a whole, to take its allegations as true, and to draw all inferences in Plaintiffs' favor.  With those requirements in mind, this Court believes the Amended Complaint sufficiently alleges that Defendants Macklin, Converse, and DiPasquale unlawfully seized the property of Plaintiffs Cottman, Spencer, and Gray.  *See, e.g., id.* ¶¶ 47-73, 128-29.

[7] Notably, however, the Amended Complaint does not state a claim that Defendant Macklin searched Ms. Cottman's phone because it alleges that "Defendant Macklin *and/or* BPD officers"

cell phone, jeans, shirt, shoes, and cash—again, all without a warrant.  *Id.* ¶ 57.  And Defendant

DiPasquale allegedly seized Mr. Gray's phone, bracelet, necklace, and clothes without a warrant.

*Id.* ¶ 61.

Similarly, the Amended Complaint states a claim against Defendant Dressler insofar as it

alleges that he unlawfully authorized the destruction of Plaintiff Carter's son's property.  *Id.* ¶ 66-

69.  Taking that allegation to be true, it states a plausible claim that he participated in violating

Plaintiff Carter's right to due process.  *See Helton v. Hunt*, 330 F.3d 242, 247 (4th Cir. 2003)

("'The constitutional right to be heard is a basic aspect of the duty of government to follow a fair

process of decisionmaking when it acts to deprive a person of his possessions.'  The due process

clause operates to protect the 'use and possession of property from arbitrary encroachment—to

minimize substantively unfair or mistaken deprivations of property[.]'") (quoting *Fuentes v.*

*Shevin*, 407 U.S. 67, 80 (1972)).  The Amended Complaint, here, alleges that *no process* was

afforded.  The Amended Complaint acknowledges that the BPD attempted to send a letter to Ms.

Carter and her deceased son, though the contents of the letter are unknown.  ECF 38 ¶ 69.

However, it also alleges that BPD officials acknowledged that Defendant Dressler's authorization

of the destruction of Ms. Carter's son's property violated BPD policy.  *Id.*  Defendants will have

the opportunity to show that Defendant Dressler's conduct did not arise to a due process violation,

but the Amended Complaint sufficiently alleges that his authorization constituted participation in

such a violation.

The Amended Complaint does not, however, allege that Defendants Walrath, O'Connor,

or Ross personally participated in any conduct that could plausibly be construed as a constitutional

---

searched the phone.  *Id.* ¶ 52 (emphasis added).  This allegation makes clear that Plaintiffs do not
know who searched Ms. Cottman's phone and, therefore, it does not state a claim against
Defendant Macklin.

violation.  The Amended Complaint merely alleges that those Defendants communicated with Ms. Carter, at various times, about her son's property, and that Defendants Walrath and Ross agreed to investigate why some of his property was destroyed.  *Id.* ¶¶ 64-70.  At worst, the Amended Complaint accuses those Defendants of being, at times, unresponsive, and accuses Defendants Walrath and Ross of failing to communicate to Ms. Carter the results of their investigation.  *Id.* Those allegations do not rise to the level of stating a claim that these Defendants were personally involved in violating Plaintiffs' constitutional rights.  Accordingly, the Amended Complaint will be dismissed as to Defendants Walrath, O'Connor, and Ross.

Moreover, the Amended Complaint does not state a claim that any of the Officer Defendants personally violated Plaintiffs' rights with respect to their allegations that Defendants failed to provide them with notice that their property had been seized.  Even if the due process clause required the BPD to provide such notice, Plaintiffs have not provided any reason to conclude that the notice must come directly from the officers seizing the property, or that it must be provided at the time the property is seized.

### 2.  Clearly Established Rights

The question, then, with respect to Defendants Macklin, Converse, DiPasquale, and Dressler, is whether the rights that they allegedly violated are clearly established.  With respect to the Fourth Amendment violations, the Officer Defendants argue that "Plaintiffs have no viable Fourth Amendment claim because, in the simplest terms, officers lawfully may seize from the person or vicinity of crime victims clothing and other personal property that may be evidence of [a] crime."  ECF 45-1 at 9.  That is undoubtedly true, but the Amended Complaint alleges that the Officer Defendants searched and seized property that was *not* evidence of a crime.  *See* ECF 38 ¶¶ 82, 84.  It is axiomatic that a police officer may not seize property whose "probative value

remain[s] uncertain," *Horton v. California*, 496 U.S. 128, 129 (1990), or when there exists no "probable cause to associate the property with criminal activity." *Texas v. Brown*, 460 U.S. 730, 738 (1983). The Fourth Amendment's requirements that officers have probable cause to seize property—whether with a warrant or based on an exception to the warrant requirement—is, therefore, "clearly established." *See, e.g.*, *Ray v. Roane*, 948 F.3d 222 (4th Cir. 2020) (officers were not entitled to qualified immunity defense where the complaint stated a plausible claim that a seizure was unconstitutional).

The same can be said for the Fourteenth Amendment's guarantee of due process before the government deprives someone of property. *Helton*, 330 F.3d at 247 ("'The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions.' The due process clause operates to protect the 'use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property[.]'") (quoting *Fuentes*, 407 U.S. at 80).

The Officer Defendants correctly cite a litany of cases highlighting the need for courts to rely on cases that precisely address the constitutional violation at issue before finding that a right is "clearly established." *See* ECF 53 at 3-4. But that requirement exists not to ensure that the same factual scenario has occurred in the past, but, rather, to ensure that the alleged constitutional violation (which is often fact-dependent) was obvious. *Anderson v. Creighton*, 483 U.S. 635, 640 (1986). Here, the alleged constitutional violations are basic and fundamental: warrantless seizures of non-evidentiary property and the eventual destruction of that property. While this Court is sensitive to the need for precision in the analysis of whether a right was "clearly established," the fact that Plaintiffs have not pointed to cases involving the rights of crime victims does not lead to the conclusion that the basic right to be free from seizures without probable cause, or the right to

be free from the deprivation of property without due process are any less "clearly established." For example, in *Turmon v. Jordan*, the Fourth Circuit found it "clearly established" that a police officer must have reasonable suspicion before arresting a suspect because "[t]he general right to be free from unreasonable seizures is as old as the Fourth Amendment, and the specific requirement that a police officer have some minimal level of objective justification before seizing a person was established by at least 1968[.]" 405 F.3d 202, 206 (4th Cir. 2005) (quotation omitted). The same is true for the Fourth Amendment's general protection against unreasonable seizures of property, its specific requirement that probable cause is required before searching and seizing evidence, and the Fourteenth Amendment's requirement that due process must be afforded before the government destroys private property. *Helton*, 330 F.3d at 247; *Fuentes*, 407 U.S. at 80.

The Officer Defendants suggest that Plaintiffs are, somehow, less entitled to Fourth Amendment protections based on their status as crime victims. ECF 53 at 6. But they misconstrue the Fourth Circuit's opinion in *United States v. Davis* in reaching that conclusion. 690 F.3d 226 (4th Cir. 2012). According to the Officer Defendants, in *Davis*, "the Fourth Circuit . . . determined that a victim's 'expectation of privacy was not implicated merely by an effort to identify, describe and catalogue his clothing as evidence of a reported crime, rather than testing anything found on it.'" ECF 53 at 6 (quoting *Davis*, 690 F.3d at 239). This finding, though, was predicated on the Fourth Circuit's earlier determination that the evidence at issue was *lawfully* searched and seized under the plain view doctrine. *Davis*, 690 F.3d at 239. Plaintiffs' property here is alleged to have been *unlawfully* seized, and there is nothing in the Fourth Circuit's opinion in *Davis* that suggests that a person has a diminished expectation of privacy solely based on status as a crime victim.

As the facts develop in this case, Defendants may uncover evidence that muddies the water with respect to whether the Officer Defendants violated clearly established rights, or even whether

they violated any rights at all.  For example, as the Officer Defendants suggest in their briefing, the facts might show that the officers had probable cause, and a valid warrant exception, to seize some of Plaintiffs' property.  As this case progresses, the Officer Defendants are free to reraise their qualified immunity defense, and, if they do, this Court will reevaluate whether Plaintiffs have done enough to overcome it.  For now, though, Plaintiffs have alleged that Defendants Macklin, Converse, DiPasquale, and Dressler personally participated in the violation of basic constitutional rights by conducting warrantless seizures of, and destroying, non-evidentiary property.  They are entitled to an opportunity to prove it.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss, ECF 45, 46, will be GRANTED in part and DENIED in part.  Count I and Counts X-XI of the Amended Complaint will be dismissed in their entirety.  The Amended Complaint will also be dismissed against all the individual Defendants insofar as they are sued in their official capacities, and it will be dismissed against all the individual defendants—except Defendants Macklin, Converse, DiPasquale, and Dressler—insofar as they are sued in their personal capacities.  A separate order follows.


Dated: January 13, 2022                                         _____/s/_____

                                                          Stephanie A. Gallagher
                                                          United States District Judge